HINES, SECRETARY OF LABOR AND INDUSTRY
OF PENNSYLVANIA, ET AL. *v.* DAVIDOWITZ ET AL.

No. 22.   Argued December 10, 11, 1940.—Decided January 20, 1941.

*Mrs. M. Louise Rutherford* and *Mr. William S. Rial,* Deputy Attorneys General of Pennsylvania, with whom *Mr. Claude T. Reno,* Attorney General, was on the brief, for appellants.

54

*Mr. Isidor Ostroff*, with whom *Mr. Herman Steerman* was on the brief, for appellees.

By special leave of Court, *Solicitor General Biddle*, with whom *Assistant Attorney General Shea* and *Messrs. Melvin H. Siegel, Richard H. Demuth*, and *Oscar H. Davis* were on the brief, for the United States, as *amicus curiae*.

58

MR. JUSTICE BLACK delivered the opinion of the Court.

This case involves the validity of an Alien Registration Act adopted by the Commonwealth of Pennsylvania.[1] The Act, passed in 1939, requires every alien 18 years or over, with certain exceptions,[2] to register once each year; provide such information as is required by the statute, plus any "other information and details" that the Department of Labor and Industry may direct; pay $1 as an annual registration fee; receive an alien identification card and carry it at all times; show the card whenever it may be demanded by any police officer or any agent of the Department of Labor and Industry; and exhibit the card as a condition precedent to registering a motor vehicle in his name or obtaining a license to operate one. The Department of Labor and Industry is charged with the duties of classifying the registrations for "the purpose of ready reference," and furnishing a copy of the classification to the Pennsylvania Motor Police. Nonexempt aliens who fail to register are subject to a fine of not

---

[1] Pa. Stats. Ann. (Purdon, Supp. 1940) tit. 35, §§ 1801–1806.

[2] The exceptions are: aliens who are the "father or mother of a son or daughter who has served in the service of the United States during any war"; aliens who have resided in the United States continuously since December 31, 1908, without acquiring a criminal record; and aliens who have filed their application for citizenship. The latter exception is qualified by the proviso that aliens in that category must still register if they "shall not have become naturalized within a period of three years" after applying for citizenship. Since federal law requires five years residence before citizenship can be acquired (8 U. S. C. § 382), this exception means that aliens may be exempt under the Pennsylvania statute for the first three years after their arrival but subject to the statute for the two years immediately preceding their eligibility for citizenship.

more than $100 or imprisonment for not more than 60 days, or both. For failure to carry an identification card or for failure to show it upon proper demand, the punishment is a fine of not more than $10, or imprisonment for not more than 10 days, or both.

A three-judge District Court enjoined enforcement of the Act, holding that it denied aliens equal protection of the laws, and that it encroached upon legislative powers constitutionally vested in the federal government.[3]  It is that judgment we are here called upon to review.[4]  But in 1940, after the court had held the Pennsylvania Act invalid, Congress enacted a federal Alien Registration Act.[5]  We must therefore pass upon the state Act in the light of the Congressional Act.[6]

The federal Act provides for a single registration of aliens 14 years of age and over; detailed information specified by the Act, plus "such additional matters as may be prescribed by the Commissioner, with the approval of the Attorney General"; finger-printing of all registrants; and secrecy of the federal files, which can be "made available only to such persons or agencies as may be designated by the Commissioner, with the approval of the Attorney General." No requirement that aliens carry a registration card to be exhibited to police or

---

[3] 30 F. Supp. 470.  One alien and one naturalized citizen joined in proceedings filed against certain state officials to enjoin enforcement of the Act.  The answer of the defendants admitted the material allegations of the petition and defended the Act on the ground that it was within the power of the state.  Plaintiffs moved for judgment on the pleadings under Rule 12(c).  The requested relief was denied as to the naturalized citizen but granted as to the alien.

[4] The case is here on appeal under § 266 of the Judicial Code, as amended (28 U. S. C. § 380).  We noted probable jurisdiction on March 25, 1940.

[5] Act of June 28, 1940, c. 439, 54 Stat. 670.

[6] Cf. *Vandenbark* v. *Owens-Illinois Glass Co.*, 311 U. S. 538.  And see *United States* v. *Schooner Peggy*, 1 Cranch 103, 110, and *Carpenter* v. *Wabash Ry. Co.*, 309 U. S. 23, 26–27.

others is embodied in the law, and only the wilful failure to register is made a criminal offense; punishment is fixed at a fine of not more than $1000, imprisonment for not more than 6 months, or both.

The basic subject of the state and federal laws is identical—registration of aliens as a distinct group. Appellants urge that the Pennsylvania law "was constitutional when passed," and that "The only question is whether the state act is in abeyance or whether the state and Federal Government have concurrent jurisdiction to register aliens for the protection of inhabitants and property." Appellees, on the other hand, contend that the Pennsylvania Act is invalid, for the reasons that it (1) denies equal protection of the laws to aliens residing in the state; (2) violates § 16 of the Civil Rights Act of 1870; [7] (3) exceeds Pennsylvania's constitutional power in requiring registration of aliens without Congressional consent. Appellees' final contention is that the power to restrict, limit, regulate and register aliens as a distinct group is not an equal and continuous concurrent power of state and nation, but that even if the state can legislate on this subject at all, its power is subordinate to supreme national law. Appellees conclude that by its adoption of a comprehensive, integrated scheme for regulation of aliens—including its 1940 registration act—Congress has precluded state action like that taken by Pennsylvania. [8]

---

[7] 16 Stat. 140, 144, 8 U. S. C. § 41: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[8] Pennsylvania is not alone among the states in attempting to compel alien registration. Several states still have dormant on their statute books laws passed in 1917–18, empowering the governor to require reg-

In the view we take it is not necessary to pass upon appellees' first, second, and third contentions, and so we pass immediately to their final question, expressly leaving open all of appellees' other contentions, including the argument that the federal power in this field, whether exercised or unexercised, is exclusive. Obviously the answer to appellees' final question depends upon an analysis of the respective powers of state and national governments in the regulation of aliens as such, and a determination of whether Congress has, by its action, foreclosed enforcement of Pennsylvania's registration law.

*First.* That the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution, was pointed out by the authors of The Federalist in 1787,[9] and has since been given continuous recognition by this Court.[10] When the national government by treaty or statute has established rules and

---

istration when state of war exists or when public necessity requires such a step. E. g., Conn. Gen. Stats. (1930) tit. 59, § 6042; Fla. Comp. Gen. Laws (1927) § 2078; Iowa Code (1939) § 503; La. Gen. Stats. (Dart, 1939) tit. 3, § 282; Me. Rev. Stats. (1930) ch. 34, § 3; N. H. Pub. Laws (1926) ch. 154; N. Y. Cons. Laws (Executive Law) § 10. Other states, like Pennsylvania, have passed registration laws more recently. E. g., S. C. Acts (1940) No. 1014, § 9, p. 1939; N. C. Code (1939) §§ 193 (a)-(h). In several states, municipalities have recently undertaken local alien registration.

Registration statutes of Michigan and California were held unconstitutional in *Arrowsmith* v. *Voorhies,* 55 F. 2d 310, and *Ex parte Ah Cue,* 101 Cal. 197, 35 P. 556.

[9] The importance of national power in all matters relating to foreign affairs and the inherent danger of state action in this field are clearly developed in Federalist papers No. 3, 4, 5, 42 and 80.

[10] E. g., *Henderson* v. *Mayor of New York,* 92 U. S. 259; *People* v. *Compagnie Generale Transatlantique,* 107 U. S. 59; *Fong Yue Ting* v. *United States,* 149 U. S. 698, 711. Cf. *Z. & F. Assets Realization Corp.* v. *Hull,* 311 U. S. 470.

regulations touching the rights, privileges, obligations or burdens of aliens as such, the treaty or statute is the supreme law of the land. No state can add to or take from the force and effect of such treaty or statute, for Article VI of the Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." The Federal Government, representing as it does the collective interests of the forty-eight states, is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties. "For local interests the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power."[11] Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference. As Mr. Justice Miller well observed of a California

---

[11] *Chinese Exclusion Case,* 130 U. S. 581, 606. Thomas Jefferson, who was not generally favorable to broad federal powers, expressed a similar view in 1787: "My own general idea was, that the States should severally preserve their sovereignty in whatever concerns themselves alone, and that whatever may concern another State, or any foreign nation, should be made a part of the federal sovereignty." Memoir, Correspondence and Miscellanies from the Papers of Thomas Jefferson (1829), vol. 2, p. 230, letter to Mr. Wythe. Cf. James Madison in Federalist paper No. 42: "The *second* class of powers, lodged in the general government, consist of those which regulate the intercourse with foreign nations. . . . This class of powers forms an obvious and essential branch of the federal administration. If we are to be one nation in any respect, it clearly ought to be in respect to other nations."

statute burdening immigration: "If [the United States] should get into a difficulty which would lead to war, or to suspension of intercourse, would California alone suffer, or all the Union?" [12]

One of the most important and delicate of all international relationships, recognized immemorially as a responsibility of government, has to do with the protection of the just rights of a country's own nationals when those nationals are in another country. Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government. [13] This country, like other nations, has entered into numerous treaties of amity and commerce since its inception—treaties entered into under express constitutional authority, and binding

---

[12] *Chy Lung* v. *Freeman,* 92 U. S. 275, 279. Cf. Alexander Hamilton in Federalist paper No. 80: "The peace of the *whole* ought not to be left at the disposal of a *part.* The Union will undoubtedly be answerable to foreign powers for the conduct of its members." That the Congress was not unaware of the possible international repercussions of registration legislation is apparent from a study of the history of the 1940 federal Act. Congressman Coffee, speaking against an earlier version of the bill, said: "Are we not guilty of deliberately insulting nations with whom we maintain friendly diplomatic relations? Are we not humiliating their nationals? Are we not violating the traditions and experiences of a century and a half?" 84 Cong. Rec. 9536.

[13] For a collection of typical international controversies that have arisen in this manner, see Dunn, The Protection of Nationals (1932), pp. 13 *et seq.* Cf. John Jay in Federalist paper No. 3: "The number of wars which have happened or will happen in the world will always be found to be in proportion to the number and weight of the causes, whether *real* or *pretended,* which *provoke* or *invite* them. If this remark be just, it becomes useful to inquire whether so many *just* causes of war are likely to be given by *United America* as by *disunited* America; for if it should turn out that United America will probably give the fewest, then it will follow that in this respect the Union tends most to preserve the people in a state of peace with other nations."

upon the states as well as the nation. Among those treaties have been many which not only promised and guaranteed broad rights and privileges to aliens sojourning in our own territory, but secured reciprocal promises and guarantees for our own citizens while in other lands. And apart from treaty obligations, there has grown up in the field of international relations a body of customs defining with more or less certainty the duties owing by all nations to alien residents—duties which our State Department has often successfully insisted foreign nations must recognize as to our nationals abroad.[14] In general, both treaties and international practices have been aimed at preventing injurious discriminations against aliens. Concerning such treaties, this Court has said: "While treaties, in safeguarding important rights in the interest of reciprocal beneficial relations, may by their express terms afford a measure of protection to aliens which citizens of one or both of the parties may not be able to demand against their own government, the general purpose of treaties of amity and commerce is to avoid injurious discrimination in either country against the citizens of the other." [15]

Legal imposition of distinct, unusual and extraordinary burdens and obligations upon aliens—such as subjecting

---

[14] "In consequence of the right of protection over its subjects abroad which every State enjoys, and the corresponding duty of every State to treat aliens on its territory with a certain consideration, an alien . . . must be afforded protection for his person and property. .·. . Every State is by the Law of Nations compelled to grant to aliens at least equality before the law with its citizens, as far as safety of person and property is concerned. An alien must in particular not be wronged in person or property by the officials and courts of a State. Thus the police must not arrest him without just cause. . . ." 1 Oppenheim, International Law (5th ed., 1937), pp. 547–548. And see 4 Moore, International Law Digest, pp. 2, 27, 28; Borchard, The Diplomatic Protection of Citizens Abroad (1928), pp. 25, 37, 73, 104.

[15] *Todok* v. *Union State Bank,* 281 U. S. 449, 454–455.

them alone, though perfectly law-abiding, to indiscriminate and repeated interception and interrogation by public officials—thus bears an inseparable relationship to the welfare and tranquillity of all the states, and not merely to the welfare and tranquillity of one. Laws imposing such burdens are not mere census requirements, and even though they may be immediately associated with the accomplishment of a local purpose, they provoke questions in the field of international affairs. And specialized regulation of the conduct of an alien before naturalization is a matter which Congress must consider in discharging its constitutional duty "To establish an Uniform Rule of Naturalization . . ." It cannot be doubted that both the state and the federal registration laws belong "to that class of laws which concern the exterior relation of this whole nation with other nations and governments." [16] Consequently the regulation of aliens is so intimately blended and intertwined with responsibilities of the national government that where it acts, and the state also acts on the same subject, "the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." [17] And where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation and has therein provided a standard for the registration of aliens, states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or aux-

---

[16] *Henderson* v. *Mayor of New York*, 92 U. S. 259, 273.

[17] *Gibbons* v. *Ogden*, 9 Wheat. 1, 211; see *Charleston & Western Carolina Ry. Co.* v. *Varnville Furniture Co.*, 237 U. S. 597. Cf. *People* v. *Compagnie Générale Transatlantique*, 107 U. S. 59, 63, where the Court, speaking of a state law and a federal law dealing with the same type of control over aliens, said that the federal law "covers the same ground as the New York statute, and they cannot co-exist."

iliary regulations.[18]  There is not—and from the very nature of the problem there cannot be—any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress.  This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference.[19]  But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick.  In the final analysis, there can be no one crystal clear distinctly marked formula.  Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[20]  And in

---

[18] Cf. *Nielsen* v. *Johnson,* 279 U. S. 47; *Asakura* v. *Seattle,* 265 U. S. 332; *International Shoe Co.* v. *Pinkus,* 278 U. S. 261, 265, and cases there cited.  And see *Savage* v. *Jones,* 225 U. S. 501, 539.  Appellant relies on *Gilbert* v. *Minnesota,* 254 U. S. 325, and *Halter* v. *Nebraska,* 205 U. S. 34, but neither of those cases is relevant to the issues here presented.

[19] E. g., *Hauenstein* v. *Lynham,* 100 U. S. 483, 489; *Geofroy* v. *Riggs,* 133 U. S. 258, 267; *Asakura* v. *Seattle,* 265 U. S. 332, 340, 342; *Nielsen* v. *Johnson,* 279 U. S. 47, 52; *Todok* v. *Union State Bank,* 281 U. S. 449, 454; *Santovincenzo* v. *Egan,* 284 U. S. 30, 40; *United States* v. *Belmont,* 301 U. S. 324, 331 (but compare the affirmance by an equally divided Court in *United States* v. *Moscow Fire Ins. Co.,* 309 U. S. 624); *Kelly* v. *Washington,* 302 U. S. 1, 10, 11; *Maurer* v. *Hamilton,* 309 U. S. 598, 604; *Bacardi Corporation* v. *Domenech,* 311 U. S. 150, 157, 167.

[20] Cf. *Savage* v. *Jones,* 225 U. S. 501, 533: "For when the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed.  If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power."

that determination, it is of importance that this legislation is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority. Any concurrent state power that may exist is restricted to the narrowest of limits; the state's power here is not bottomed on the same broad base as is its power to tax.[21] And it is also of importance that this legislation deals with the rights, liberties, and personal freedoms of human beings, and is in an entirely different category from state tax statutes or state pure food laws regulating the labels on cans.[22]

Our conclusion is that appellee is correct in his contention that the power to restrict, limit, regulate, and register aliens as a distinct group is not an equal and continuously existing concurrent power of state and nation, but that whatever power a state may have is subordinate to supreme national law.[23] We proceed there-

---

[21] Express recognition of the breadth of the concurrent taxing powers of state and nation is found in Federalist paper No. 32.

[22] It is true that where the Constitution does not of itself prohibit state action, as in matters related to interstate commerce, and where the Congress, while regulating related matters, has purposely left untouched a distinctive part of a subject which is peculiarly adapted to local regulation, the state may legislate concerning such local matters which Congress could have covered but did not. *Kelly* v. *Washington*, 302 U. S. 1, 9, 10, 11, 12, 13, 14 (inspection for seaworthiness of hull and machinery of motor-driven tugs). And see *Reid* v. *Colorado*, 187 U. S. 137, 147 (prohibition on introduction of diseased cattle or horses); *Savage* v. *Jones*, 225 U. S. 501, 529, 532 (requirement that certain labels reveal package contents); *Carey* v. *South Dakota*, 250 U. S. 118, 121 (prohibition of shipment by carrier of wild ducks); *Dickson* v. *Uhlmann Grain Co.*, 288 U. S. 188, 199 (prohibition of margin transactions in grain where there is no intent to deliver); *Mintz* v. *Baldwin*, 289 U. S. 346, 350–352 (inspection of cattle for infectious diseases); *Maurer* v. *Hamilton*, 309 U. S. 598, 604, 614 (prohibition of car-over-cab trucking).

[23] As supporting the contention that the state can enforce its alien registration legislation, even though Congress has acted on the identical

fore to an examination of Congressional enactments to ascertain whether or not Congress has acted in such manner that its action should preclude enforcement of Pennsylvania's law.

*Second.* For many years Congress has provided a broad and comprehensive plan describing the terms and conditions upon which aliens may enter this country, how they may acquire citizenship, and the manner in which they may be deported. Numerous treaties, in return for reciprocal promises from other governments, have pledged the solemn obligation of this nation to the end that aliens residing in our territory shall not be singled out for the imposition of discriminatory burdens. Our Constitution and our Civil Rights Act have guaranteed to aliens "the equal protection of the laws [which] is a pledge of the protection of equal laws." [24] With a view to limiting prospective residents from foreign lands to those possessing the qualities deemed essential to good and useful citizenship in America, carefully defined qualifications are required to be met before aliens may enter our country. These qualifications include rigid requirements as to health, education, integrity, character, and adaptability to our institutions. Nor is the alien left free from the

---

subject, appellant relies upon a number of previous opinions of this Court. *Ohio ex rel. Clarke* v. *Deckebach,* 274 U. S. 392, 395, 396; *Frick* v. *Webb,* 263 U. S. 326, 333; *Webb* v. *O'Brien,* 263 U. S. 313, 321, 322; *Terrace* v. *Thompson,* 263 U. S. 197, 223, 224; *Heim* v. *McCall,* 239 U. S. 175, 193, 194. In each of those cases this Court sustained state legislation which applied to aliens only, against an attack on the ground that the laws violated the equal protection clause of the Constitution. In each case, however, the Court was careful to point out that the state law was not in violation of any valid treaties adopted by the United States, and in no instance did it appear that Congress had passed legislation on the subject. In the only case of this type in which there was an outstanding treaty provision in conflict with the state law, this Court held the state law invalid. *Asakura* v. *Seattle,* 265 U. S. 332.

[24] *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369.

application of federal laws after entry and before naturalization. If during the time he is residing here he should be found guilty of conduct contrary to the rules and regulations laid down by Congress, he can be deported. At the time he enters the country, at the time he applies for permission to acquire the full status of citizenship, and during the intervening years, he can be subjected to searching investigations as to conduct and suitability for citizenship.[25] And in 1940 Congress added to this comprehensive scheme a complete system for alien registration.

The nature of the power exerted by Congress, the object sought to be attained, and the character of the obligations imposed by the law, are all important in considering the question of whether supreme federal enactments preclude enforcement of state laws on the same subject.[26] Opposition to laws permitting invasion of the personal liberties of law-abiding individuals, or singling out aliens as particularly dangerous and undesirable groups, is deep-seated in this country. Hostility to such legislation in America stems back to our colonial history,[27] and champions of freedom for the individual have always vigorously opposed burdensome registration systems. The drastic requirements of the alien Acts of 1798 [28] brought about a political upheaval in this country the repercussions from which have not even yet wholly subsided.[29] So violent was the reaction to the 1798 laws that almost a century elapsed before a second registration

[25] 8 U. S. C. §§ 152, 373, 377 (c), 382, 398, 399 (a).

[26] Cf. *Prigg* v. *Pennsylvania,* 16 Pet. 539, 622, 623.

[27] As early as 1641, in the Massachusetts "Body of Liberties," we find the statement that "Every person within this Jurisdiction, whether inhabitant or forreiner, shall enjoy the same justice and law that is generall for the plantation . . ."

[28] 1 Stat. 570, 577.

[29] See Field, J., dissenting in *Fong Yue Ting* v. *United States,* 149 U. S. 698, 746–750. Cf. 84 Cong. Rec. 9534.

act was passed. This second law, which required Chinese to register and carry identification cards with them at all times, was enacted May 5, 1892. An opponent of this legislation, speaking in the Senate of the requirement that cards be carried, said: "[The Chinese covered by the Act] are here ticket-of-leave men; precisely as, under the Australian law, a convict is allowed to go at large upon a ticket-of-leave, these people are to be allowed to go at large and earn their livelihood, but they must have their tickets-of-leave in their possession. . . . This inaugurates in our system of government a new departure; one, I believe never before practised, although it was suggested in conference that some such rules had been adopted in slavery times to secure the peace of society." [30]

For many years bills have been regularly presented to every Congress providing for registration of aliens. Some of these bills proposed annual registration of aliens, issuance of identification cards containing information about and a photograph of the bearer, exhibition of the cards on demand, payment of an annual fee, and kindred requirements. [31] Opposition to these bills was based upon charges that their requirements were at war with the fundamental principles of our free government, in that they would bring about unnecessary and irritating restrictions upon personal liberties of the individual, and would subject aliens to a system of indiscriminate questioning similar to the espionage systems existing in other lands. [32]

---

[30] Quoted in *Fong Yue Ting* v. *United States, supra,* 743.

[31] E. g., H. R. 9101 and H. R. 9147, 71st Cong., 2nd Session; see 72 Cong. Rec. 3886.

[32] The requirement that cards be carried and exhibited has always been regarded as one of the most objectionable features of proposed registration systems, for it is thought to be a feature that best lends itself to tyranny and intimidation. Congressman Celler, speaking in

When Congress passed the Alien Registration Act of 1940, many of the provisions which had been so severely criticized were not included.[33] The Congressional purpose, as announced by the chairman of the Senate subcommittee which drafted the final bill, was to "work . . . the new provisions into the existing [immigration and naturalization] laws, so as to make a harmonious whole." [34] That "harmonious whole" included the "Uniform Rule of Naturalization" the Constitution empow-

1928 of the repeated defeat of registration bills and of an attempt by the Secretary of Labor to require registration of incoming aliens by executive order, said: "But here is the real vice of the situation and the core of the difficulty: 'The admitted alien,' as the order states, 'should be cautioned to present [his card] for inspection if and when subsequently requested so to do by an officer of the Immigration Service.'" 70 Cong. Rec. 190.

[33] Congressman Smith, who introduced the original of the bill that as finally adopted became the 1940 Act, said in Committee: "The drafting of the bill is . . . a codification of measures that have been offered from time to time. . . . I have tried to eliminate from the bills that have been offered on the subject those which seemed to me would cause much controversy." Hearings before Subcommittee No. 3 of the House Judiciary Committee, H. R. 5138, April 12, 1939, p. 71.

[34] Cong. Rec., June 15, 1940, p. 12620. Senator Connally made this statement in explaining why it had been found necessary to substitute a new bill for the bill originally sent to the Senate by the House. In detailing the care that had been taken in the drafting of the new measure, he said: "We regretted very much that we had to discard entirely the bill passed by the House and substitute a new bill after the enacting clause. However, we called in Mr. Murphy, of the Drafting Service, who worked with us some 2 weeks every day . . . We called on the Department of Justice, and had the Solicitor General with us. We called in the Commissioner of Immigration and Naturalization, and together we went over all the existing laws, and worked the new provisions into the existing laws, so as to make a harmonious whole." This Senate version was substantially the Act as finally adopted; the alien registration provisions are title III of a broader Act dealing with deportable offenses and advocacy of disloyalty in the armed forces.

ered the Congress to provide.[35]   And as a part of that "harmonious whole," under the federal Act aliens need not carry cards, and can only be punished for wilful failure to register.[36]   Further, registration records and fingerprints must be kept secret and cannot be revealed except to agencies—such as a state—upon consent of the Commissioner and the Attorney General.

We have already adverted to the conditions which make the treatment of aliens, in whatever state they may be located, a matter of national moment.   And whether or not registration of aliens is of such a nature that the Constitution permits only of one uniform national system, it cannot be denied that the Congress might validly conclude that such uniformity is desirable.   The legislative history of the Act indicates that Congress was trying to steer a middle path, realizing that any registration requirement was a departure from our traditional policy of not treating aliens as a thing apart, but also feeling that the Nation was in need of the type of information to

---

[35] In Federalist paper No. 42, the reasons for giving this power to the federal government are thus explained: "By the laws of several States, certain descriptions of aliens, who had rendered themselves obnoxious, were laid under interdicts inconsistent not only with the rights of citizenship but with the privilege of residence.   What would have been the consequence, if such persons, by residence or otherwise, had acquired the character of citizens under the laws of another State . . .? Whatever the legal consequences might have been, other consequences would probably have resulted, of too serious a nature not to be provided against.   The new Constitution has accordingly, with great propriety, made provision against them, and all others proceeding from the defect of the Confederation on this head, by authorizing the general government to establish a uniform rule of naturalization throughout the United States."

[36] That the Congressional decision to punish only wilful transgressions was deliberate rather than inadvertent is conclusively demonstrated by the debates on the bill.   E. g., Cong. Rec., June 15, 1940, p. 12621.   And see note 37, *infra*.

be secured.[37]   Having the constitutional authority so to do, it has provided a standard for alien registration in a single integrated and all-embracing system in order to obtain the information deemed to be desirable in connection with aliens.   When it made this addition to its uniform naturalization and immigration laws, it plainly manifested a purpose to do so in such a way as to protect the personal liberties of law-abiding aliens through one uniform national registration system, and to leave them free from the possibility of inquisitorial practices and police surveillance that might not only affect our international relations but might also generate the very disloyalty which the law has intended guarding against. Under these circumstances, the Pennsylvania Act cannot be enforced.   Accordingly, the judgment below is

*Affirmed.*

MR. JUSTICE STONE, dissenting:

I think the judgment below should be reversed.

Undoubtedly Congress, in the exercise of its power to legislate in aid of powers granted by the Constitution to the national government may greatly enlarge the exercise of federal authority and to an extent which need not now be defined, it may, if such is its will, thus subtract from the powers which might otherwise be exercised by

---

[37] Congressman Celler, ranking member of the House Judiciary Committee which reported out the bill, said in stating his intention of voting for the 1940 Act: "Mr. Speaker, judging the temper of the Nation, I believe this compromise report is the best to be had under the circumstances and I shall vote for it . . . Furthermore, I think the conferees have done a good job because the punishment is not too great . . . There must be proof . . . that the alien willfully refuses to register . . . I drew the minority report against this bill originally, because it provided some very harsh provisions against aliens.   Some of the harshness and some of the severity of the original bill have been eliminated . . . I must admit that it is the best to be had under the circumstances."   Cong. Rec., June 22, 1940, pp. 13468-9.

the states. Assuming, as the Court holds, that Congress could constitutionally set up an exclusive registration system for aliens, I think it has not done so and that it is not the province of the courts to do that which Congress has failed to do.

At a time when the exercise of the federal power is being rapidly expanded through Congressional action, it is difficult to overstate the importance of safeguarding against such diminution of state power by vague inferences as to what Congress might have intended if it had considered the matter or by reference to our own conceptions of a policy which Congress has not expressed and which is not plainly to be inferred from the legislation which it has enacted. Cf. *Graves* v. *O'Keefe,* 306 U. S. 466, 479, 480, 487. The Judiciary of the United States should not assume to strike down a state law which is immediately concerned with the social order and safety of its people unless the statute plainly and palpably violates some right granted or secured to the national government by the Constitution or similarly encroaches upon the exercise of some authority delegated to the United States for the attainment of objects of national concern.

The opinion of the Court does not deny, and I see no reason to doubt that the Pennsylvania registration statute, when passed, was a lawful exercise of the constitutional power of the state. With exceptions not now material it requires aliens resident in the state, who have not declared their intention to become citizens, to register annually, to pay a registration fee of $1.00, and to carry a registration identification card. It affords to the state a convenient method of ascertaining the number and whereabouts of aliens within the state, which it is entitled to know, and a means of their identification. It is an available aid in the enforcement of a number of statutes of the state applicable to aliens whose constitu-

tional validity has not been questioned, one of which has been held by this Court not to infringe the Fourteenth Amendment. *Patsone* v. *Pennsylvania,* 232 U. S. 138.[1]

The national government has exclusive control over the admission of aliens into the United States but, after entry, an alien resident within a state, like a citizen, is subject to the police powers of the state and, in the exercise of that power, state legislatures may pass laws applicable exclusively to aliens so long as the distinction taken between aliens and citizens is not shown to be without rational basis. *Patsone* v. *Pennsylvania, supra; Terrace* v. *Thompson,* 263 U. S. 197; *Cockrill* v. *California,* 268 U. S. 258; *Ohio* v. *Deckebach,* 274 U. S. 392, 396, and cases cited. The federal government has no general police power over aliens and, so far as it can exercise any control over them, it must be in the pursuance of a power granted to it by the Constitution.

The opinion of the Court does not support its conclusion upon the ground that in the absence of federal legislation on the subject there is any want of power in the state to pass the present statute. It does not suggest, nor could it well do so, that in the absence of Congressional action the Pennsylvania statute either by its own terms or in its operation interferes with or obstructs the author-

---

[1] Tit. 34 § 1311.1001, Purdon's Penn. Stat. Ann., prohibiting hunting by aliens, was sustained in the *Patsone* case, 232 U. S. 138. Cf. Tit. 30 § 240. Other Pennsylvania statutes whose validity has not been passed upon regulate the activities of aliens: Tit. 63, setting forth license requirements for the practice of certain professions and occupations, makes special requirements for aliens seeking to practice as certified public accountants (§ 1), architects (§ 22), engineers (§ 137), nurses (§ 202), physicians and surgeons (§ 406), and undertakers (§ 478c). The real property holdings of aliens are limited to 5000 acres of land or land producing net income of $20,000 or less (Title 68, §§ 28, 32). Taxes are to be deducted from the wages of aliens by their employers when the tax collector requests (Tit. 72, § 5681).

ity conferred by the Constitution on the national government over the national defense, the conduct of foreign relations, its powers over immigration and deportation of aliens or their naturalization. The existence of the national power to conduct foreign relations and negotiate treaties does not foreclose state legislation dealing exclusively with aliens as such. This. Court has consistently held that treaties of the United States for the protection of resident aliens do not supersede such legislation unless they conflict with it. See *Ohio* v. *Deckebach, supra,* 395 and cases cited; *Todok* v. *Union State Bank,* 281 U. S. 449, 454 *et seq.;* cf. *Nielsen* v. *Johnson,* 279 U. S. 47. It is not contended that the Pennsylvania statute conflicts with any term of any treaty.

The question presented here is a different one from that considered in *Henderson* v. *Mayor of New York,* 92 U. S. 259, 273, where the state taxation and registration of all persons entering the United States through a port of the state was held to be a regulation of foreign commerce forbidden to the states by the Constitution, even though Congress had passed no similar legislation. The registration of aliens resident in a state is not a regulation of interstate or foreign commerce or of the entry or deportation of aliens and would seem to be no more an exercise of any power granted to the national government, or an encroachment upon it, than is a state census for local purposes an infringement of the national authority to take a national census for national purposes. It is the federal act alone which is pointed to as curtailing or withdrawing the reserved power of the state over its alien population.

Title I of the federal statute penalizes certain acts of any persons intended to interfere with, impair or influence the loyalty, morale or discipline of the military or naval forces of the United States. Title II, among other things, provides for the deportation of aliens after con-

viction and service of sentence for violations of the provisions of Title I. And the evident purpose of the registration provisions of Title III is to aid in the enforcement of the other provisions of the Act and in the prevention of subversive activities of aliens resident within the United States. It requires the registration and fingerprinting of all aliens over fourteen years of age, with exceptions not now material, who are not registered and fingerprinted upon entering the country. Registered aliens resident in the United States are required to notify the Commissioner of Immigration of any change of residence and penalties are imposed for wilful non-compliance. As construed and applied by the opinion of the Court the federal act denies to the states the practicable means of identifying their alien residents and of recording their whereabouts and it withholds from the states the benefit of the information secured under the federal act except insofar as it may be made available to them on application to the Attorney General.

It is conceded that the federal act in operation does not at any point conflict with the state statute, and it does not by its terms purport to control or restrict state authority in any particular. But the government says that Congress by passing the federal act, has "occupied the field" so as to preclude the enforcement of the state statute and that the administration of the latter might well conflict with Congressional policy to protect the civil liberty of aliens against the harassments of intrusive police surveillance.

Little aid can be derived from the vague and illusory but often repeated formula that Congress "by occupying the field" has excluded from it all state legislation. Every Act of Congress occupies some field, but we must know the boundaries of that field before we can say that it has precluded a state from the exercise of any power reserved to it by the Constitution. To discover

the boundaries we look to the federal statute itself, read in the light of its constitutional setting and its legislative history.

Federal statutes passed in aid of a granted power obviously supersede state statutes with which they conflict. *Pennsylvania R. Co.* v. *Illinois Brick Co.,* 297 U. S. 447, 459. See *Kelly* v. *Washington,* 302 U. S. 1, 10. But we are pointed to no such conflict here. In the exercise of such powers Congress also has wide scope for prohibiting state regulation of matters which Congress may, but has not undertaken to regulate itself. But no words of the statute or of any committee report, or any Congressional debate indicate that Congress intended to withdraw from the states any part of their constitutional power over aliens within their borders. We must take it that Congress was not unaware that some nineteen states have statutes or ordinances requiring some form of registration for aliens, seven of them dating from the last war. The repeal of this legislation is not to be inferred from the silence of Congress in enacting a law which at no point conflicts with the state legislation and is harmonious with it.

The exercise of the federal legislative power is certainly not more potent to curtail the exercise of state power over aliens than is the exercise of the treaty making power. Yet as we have seen no treaty has that effect unless it conflicts with a state statute. The passage of the National Pure Food & Drug Act did not preclude the states from supplementing it by like additional requirements not conflicting with those of the Congressional act. *Savage* v. *Jones,* 225 U. S. 501. The enactment of federal laws for the inspection, as a safety measure, of vessels plying navigable waters of the United States does not foreclose the states from like inspection of the hull and machinery of such vessels within the state, to insure safety and determine seaworthiness, demands

which lie outside the federal requirements. *Kelly* v. *Washington, supra.* The passage of the National Draft and the National Espionage Acts with their penalties for violation, did not preclude a state from making it a misdemeanor for any person to advocate that citizens of the state refuse to aid or assist the United States in carrying on a war. *Gilbert* v. *Minnesota,* 254 U. S. 325; cf. *Halter* v. *Nebraska,* 204 U. S. 34; see also *Reid* v. *Colorado,* 187 U. S. 137; *Carey* v. *South Dakota,* 250 U. S. 118; *Dickson* v. *Uhlmann Grain Co.,* 288 U. S. 188; *Mintz* v. *Baldwin,* 289 U. S. 346; *Maurer* v. *Hamilton,* 309 U. S. 598, 614. These are but a few of the many examples of the long established principle of constitutional interpretation that an exercise by the state of its police power, which would be valid if not superseded by federal action, is superseded only where the repugnance or conflict is so "direct and positive" that the two acts cannot "be fairly reconciled or consistently stand together." *Sinnot* v. *Davenport,* 22 How. 227, 243; *Kelly* v. *Washington, supra,* 10. A federal registration act designed to aid in enforcing federal statutes and to prevent subversive activities against the national government can stand consistently with a like statute applicable to residents passed in aid of state laws and as a safeguard to property and persons within the state, as readily as the federal and state laws which annually demand two separate income tax returns of the citizen.

The Fourteenth Amendment guarantees the civil liberties of aliens as well as of citizens against infringement by state action in the enactment of laws and their administration as well. Again we are pointed to nothing in the Federal Alien Registration Act or in the records of its passage through Congress to indicate that Congress thought those guarantees inadequate or that in requiring registration of all aliens it undertook to prevent the states from passing any registration measure otherwise constitutional. True, it was careful to bring the new

legislation into harmony with existing federal statutes and to avoid, so far as consistent with its purposes, any harsh or oppressive requirements, but in all this there is to be found no warrant for saying that there was a Congressional purpose to curtail the exercise of any constitutional power of the state over its alien residents or to protect the alien from state action which the Constitution prohibits and which the federal courts stand ready to prevent. See *Hague* v. *C. I. O.*, 307 U. S. 496, 518, 525 *et seq.*

Here compliance with the state law does not preclude or even interfere with compliance with the act of Congress. The enforcement of both acts involves no more inconsistency, no more inconvenience to the individual, and no more embarrassment to either government than do any of the laws, state and national, such as revenue laws, licensing laws, or police regulations, where interstate commerce is involved, which are equally applied to the citizen because he is subject, as are aliens, to a dual sovereignty.

The CHIEF JUSTICE and MR. JUSTICE McREYNOLDS concur in this opinion.