**SATURN DISTRIBUTION CORPORATION,**
Plaintiff,

v.

**Donald E. WILLIAMS, Commissioner of the Department of Motor Vehicles, Commonwealth of Virginia, Defendant,**

and

**Virginia Automobile Dealers Association, Inc., Intervenor.**

**Civ. A. No. 89–319–R.**

United States District Court, E.D. Virginia, Richmond Division.

Aug. 17, 1989.

**1148**

David F. Peters, E. Milton Farley, III, Hunton & Williams, Richmond, Va., Stephen M. Shapiro, Richard J. Favretto, Mayer, Brown & Platt, Chicago, Ill., Roderick

D. Gilliam, Saturn Corp., Troy, Mich., for plaintiff.

Jeffrey A. Spencer, Eric K. G. Fiske, Asst. Attys. Gen., Richmond, Va., for defendant.

Malvin W. Brubaker, William T. Lehner, Richmond, Va., for intervenor.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

The plaintiff in this case is suing for a declaratory judgment that § 46.1–550.5:27(10) of the Code of Virginia, as interpreted by the Commissioner of Motor Vehicles is preempted by Section 2 of the Federal Arbitration Act, 9 U.S.C. § 2. The parties agree that there are no issues of material fact in dispute, and have submitted opposing motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*Background*

The plaintiff, Saturn Distribution Corporation, is a wholly-owned subsidiary of Saturn Corporation, which is, in turn, a wholly-owned subsidiary of General Motors Corporation. Saturn was created in 1985 to design, manufacture and market a new model of car. In so doing, it adopted what it calls a new "Mission and Philosophy" of manufacturing and marketing cars, including a determination "to further the spirit of trust and respect which is critical to the relationship" between Saturn and its dealers. *Saturn Distribution Corporation Dealer Agreement*, at 1 (hereinafter "Dealer Agreement"). In order to promote this new Mission and Philosophy and further cooperation, Saturn developed an alternative dispute resolution system, including binding arbitration,[1] and made it a mandatory part of the Dealer Agreement.[2]

1. The system involves two steps, the first of which involves nonbinding mediation. If the claim is not resolved by mediation, it may then be submitted to binding arbitration. Both the mediation and the arbitration panels are to consist of two dealers and two Saturn representatives, and are expected to reach a consensus solution. *Dealer/Saturn Dispute Resolution Guide*, at 14–20.

2. The relevant language is found in Article 5 of the Dealer Agreement:

[Saturn] and Dealer acknowledge that, at the state and federal levels, various courts and agencies would, in the absence of this Article 5, be available to them to resolve claims or controversies which might arise between them. [Saturn] and Dealer agree that it is inconsistent with the Mission and Philosophy

The Virginia Motor Vehicle Dealer Licensing Act, Va.Code Ann. §§ 46.1–515 et seq., was enacted to protect automobile dealers from the imbalances in bargaining power inherent in their relationships with automobile manufacturers. Section 46.1–550.5:27(10) states that an automobile distribution agreement must contain language identical in effect to the following:

If any provision herein contravenes the valid laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be deemed to be modified to conform to such laws or regulations, and all other terms and provisions shall remain in full force and effect.

Section 46.1–550.5:24 requires that distributors submit franchise agreements to the Commissioner of Motor Vehicles for approval.

Defendant Donald E. Williams is Commissioner of the Department of Motor Vehicles. When Saturn submitted its agreement, containing the exclusive arbitration clause, to him, he refused to approve it. He stated that he would, however, approve an agreement that gives the dealer the option to delete the exclusive arbitration clause. He made it clear that this did not mean that Saturn would be prohibited from including an arbitration clause in its agreement. Rather, Saturn would not be permitted to make the inclusion of the arbitration clause a prerequisite to becoming a Saturn dealer.[3] The Commissioner informed Saturn that it would be able to develop, on its own, a method of explaining to potential dealers that they had the option to accept or reject the arbitration clause in their agreements.

Saturn is now suing under the Supremacy Clause, U.S. Const., art. 6, claiming that § 46.1–550.5:27(10) is preempted by § 2 of the Federal Arbitration Act (FAA), 9 U.S.C. § 2. That section reads:

A ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Saturn requests a declaratory judgment stating that § 46.1–550.5:27(10) as applied by the Commissioner to Saturn's agreement is preempted by § 2 of the FAA, and that the exclusive arbitration provision of Saturn's agreement is valid, as well as a permanent injunction prohibiting the Commissioner from preventing or discouraging the use or enforcement of exclusive arbitration clauses between Saturn and its dealers.

The Virginia Automobile Dealers Association (VADA) is a trade association representing six hundred new car and truck dealers in Virginia. On June 27, 1989, VADA sought, and the Court granted, leave to intervene as a defendant in this case.

*Discussion*

The defendant and intervenor first argue that this Court does not have subject matter jurisdiction of this case. The Supreme

---

for either to use courts or governmental agencies to resolve such claims or controversies. THEREFORE, CONSISTENT WITH THE PROVISIONS OF THE UNITED STATES ARBITRATION ACT (9 U.S.C. Section 1 et seq.), DEALER AND [SATURN] AGREE THAT THE DISPUTE RESOLUTION PROCESS OUTLINED IN THIS ARTICLE, WHICH INCLUDES BINDING ARBITRATION, SHALL BE THE EXCLUSIVE MECHANISM FOR RESOLVING ANY CONTROVERSY OR CLAIM BETWEEN THEM ARISING OUT OF OR RELATING TO THIS AGREEMENT, ITS CREATION, OR TERMINATION.
Dealer Agreement, at 3.

**3.** The Commissioner notes that he could have chosen to interpret § 46.1–550.5:27(10) as forbidding even bargained-for arbitration clauses, but that such an interpretation would clearly conflict with federal policies favoring voluntary arbitration. Instead, he has chosen the more flexible interpretation that such clauses are acceptable if the dealer has the option to reject them. This interpretation should be accepted as authoritative. *Hoffman Estates v. Flipside, Hoffman Estates Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191 n. 5, 71 L.Ed.2d 362 (1982).

Court has ruled that Supremacy Clause challenges to state laws present federal questions under 28 U.S.C. § 1331. *Shaw v. Delta Airlines,* 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 2899 n. 14, 77 L.Ed.2d 490 (1983). This Court therefore properly has jurisdiction of this case.

In order to prevail on its preemption argument, the plaintiff must demonstrate that the Virginia statute, as interpreted by the Commissioner, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Federal Arbitration Act. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941), quoted in *Volt Information Sciences v. Board of Trustees,* — U.S. —, —, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488, 499 (1989). The FAA was enacted to ensure that agreements to arbitrate would be enforced in court " 'upon' the same footing as other contracts.' " *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 1241, 84 L.Ed.2d 158 (1985), quoting H.R. Rep. No. 96, 68th Cong., 1st Sess. 1 (1924). " '[T]he purpose of the act was to assure those who desired arbitration and whose contracts related to interstate commerce that their expectations would not be undermined by federal judges or by state courts or legislatures.' " *Southland Corp. v. Keating,* 465 U.S. 1, 13, 104 S.Ct. 852, 859, 79 L.Ed.2d 1 (1984), quoting *Metro Industrial Painting Corp. v. Terminal Construction Co.,* 287 F.2d 382, 387 (2d Cir.1961); *accord Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 10, 103 S.Ct. 927, 933, 74 L.Ed.2d 765 (1983). Indeed, on all previous occasions in which the FAA has come before the Supreme Court, it was in the context of the enforceability of an existing arbitration agreement. *See, e.g., Rodriguez de Quijas v. Shearson/American Express,* — U.S. —, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Volt Information, supra; Shearson/American Express v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Perry v. Thomas,* 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614,

105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Byrd, supra; Southland, supra; Moses H. Cone, supra; Scherk v. Alberto-Culver,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

Although the primary purpose of the FAA is to ensure the enforceability of arbitration agreements, common sense dictates that a state should not be able to escape its enforcement duties under § 2 by banning the formation of arbitration agreements. The Fourth Circuit recognized this principle in *Supak & Sons Mfg. Co., Inc. v. Pervel Industries, Inc.,* 593 F.2d 135 (4th Cir. 1979). Although *Supak* held that § 2 "does not displace state law on the general principles governing formation of the contract itself," it also stated:

> Perhaps, although we do not decide the point, § 2 would preempt a state rule of contract formation which applied only to arbitration clauses and which placed an unreasonable burden on the parties' ability to commit themselves to arbitration.

*Id.* at 137; *see also Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9, 96 L.Ed.2d at 437, n. 9 ("A state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with ... § 2."). The plaintiff in the present case argues that § 46.1–550.5:27(10) is preempted by the FAA because it singles out arbitration clauses and subjects only such clauses to the opt-out treatment.

The Virginia statute does not subject arbitration clauses to burdens not felt by other types of contracts. In fact, an overview of the law of Virginia that governs the formation of contracts reveals that § 46.1–550.5:27(10), as interpreted by the Commissioner, affords privileged status to arbitration agreements. Other provisions of the Virginia Motor Vehicle Dealer Licensing Act, not to mention the Insurance Code, Va.Code §§ 38.2–100 et seq., the Beer Franchise Act, *id.* §§ 4–118.3 et seq., the Wine Franchise Act, *id.* §§ 4–118.42 et seq., the Retail Franchising Act, *id.* §§ 13.- 1–557 et seq., the Petroleum Products

Franchise Act, *id.* §§ 59.1–21.8 et seq., as well as provisions governing sports agents contracts, *id.* §§ 18.2–501.1 et seq., and preneed funeral contracts, *id.* § 54.1–2820, dictate the form of certain types of contracts, with no opportunity whatsoever for negotiation.

In the case of the Motor Vehicle Dealer Licensing Act, for example, the manufacturer may not prevent the sale or transfer of the dealership without notice to the dealer and, if requested, a hearing before the Commissioner, § 46.1–550.5:27(3), nor may it sign a contract with a new dealership within a certain geographic proximity to an existing dealer, without notice and a hearing. § 46.1–550.5:27(4). It is unlawful to include provisions in a franchise agreement that violate these sections. § 46.1–550.5:27(9).[4] The Commissioner has not interpreted § 46.1–550.5:27(9) to allow the parties to give evidence, in the form of opt-out language, that they have negotiated and agreed to a provision that violates one of these sections. It is simply unlawful to include such a provision. Only with respect to arbitration clauses does the Commissioner allow the parties to negotiate to include an otherwise impermissible term. Section 46.1–550.5:27(10) does not, therefore, single out arbitration agreements for special treatment that "burden[s] ... the parties' ability to commit themselves to arbitration," *Supak*, 593 F.2d at 137. Rather, among the plethora of Virginia laws designed to govern the formation of various types of contracts, it grants a flexibility not permitted with respect to any other type of provision.

 Section 46.1–550.5:27(10), as interpreted by the Commissioner, in no way "stands as an obstacle to the accomplishment and execution of the full purposes and objectives," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581

(1941), of the Federal Arbitration Act. Arbitration, in order to be legitimate, must result from the acquiescence of both parties; it may not be imposed by one party upon the other. A New York state court has noted that

> arbitration is consensual in nature. The fundamental assumption of arbitration is that it may be invoked as an alternative to the settlement of disputes through the judicial process "solely by reason of an exercise of choice by [all] parties."

*Miner v. Walden*, 101 Misc.2d 814, 422 N.Y.S.2d 335, 337 (N.Y.Sup.Ct.1979), quoting Henderson, *Contractual Problems in the Enforcement of Agreements to Arbitrate Medical Malpractice*, 58 Va.L.Rev. 947, 985 (1972); *see also Domke on Commercial Arbitration* at 1 (1988). A colloquy that occurred during the 1923 hearings on the proposed FAA indicates that several of the proponents of the bill did not envision that it would be applied to contracts of adhesion, but rather to voluntary agreements among merchants. Hearings on S.4213 and S.4214 Before the Subcommittee of the Committee on the Judiciary, 67th Cong., 4th Sess. 9–11 (1923). The Supreme Court also acknowledged this principle when it stated that, "Arbitration under the Act is a matter of consent, not coercion." *Volt Information*, —— U.S. at ——, 109 S.Ct. at 1255–56, 103 L.Ed.2d at 500. By ensuring consensual rather than forced arbitration, the Virginia statute is entirely in harmony with the Federal Arbitration Act.[5]

The plaintiffs cite two appellate court cases and one recent district court case in support of their motion. *Collins Radio Co. v. Ex–Cell–O Corp.*, 467 F.2d 995 (8th Cir.1972), *Webb v. R. Rowland & Co., Inc.*, 800 F.2d 803 (8th Cir.1986), and *Securities Industry Ass'n v. Connolly*, 703 F.Supp. 146 (D.Mass.1988). *Collins Radio* and *Webb* are both easily distinguishable from

---

**4.** The Fourth Circuit has held that the predecessor to the statute presently at issue does not violate the commerce clause or the due process clause. *American Motors Sales Corp. v. Division of Motor Vehicles*, 592 F.2d 219 (1979); *see also New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978).

**5.** Considering the glowing terms in which the plaintiff's attorneys, briefs and documents all describe Saturn's new Mission and Philosophy, the Court rests easy in the knowledge that the plaintiff should have little need for the coercion for which it is fighting here, but instead will easily persuade its new dealers to consent voluntarily to its dispute resolution process.

the present case, as both involved existing agreements to arbitrate, which the Eighth Circuit held enforceable in accordance with the dictates of § 2. In addition, the state statutes at issue in those two cases very explicitly singled out arbitration agreements, with one requiring the acknowledgment of an attorney for each party that his client has been advised of the ramifications of agreeing to arbitrate, *Collins Radio*, 467 F.2d at 997, and the other requiring arbitration clauses to be introduced by a notice, in ten-point capital letters. *Webb*, 800 F.2d at 805. As explained above, the statute challenged in the present case does not single out arbitration clauses for such special treatment, but rather forms part of an overall program of regulation of potentially adhesive contracts.

*Connolly* is the only other preemption case under the FAA in which the plaintiffs were seeking the invalidation of a state law regulating the formation of arbitration agreements, rather than the enforcement of an existing arbitration agreement. The Massachusetts regulations challenged in *Connolly* prohibited broker-dealers from making an arbitration agreement a prerequisite for opening an account, and required broker-dealers to disclose the legal effects of such an agreement. *Id.*, 703 F.Supp. at 148–49. These regulations are, with respect to the first of these provisions, similar to the statute at issue in the present case, in that they basically prohibit adhesive arbitration agreements. Judge Woodlock held that the state regulations were preempted

> [b]ecause the voluntariness concerns expressed in the unique Massachusetts securities arbitration regulations impose conditions on the formation and execution of arbitration agreements which are not part of the generally applicable contract law of Massachusetts …

*Id.* at 153.

The present case is distinguishable from *Connolly*. The defendants in that case admitted that the regulations in question singled out arbitration agreements. *Id.*, 703 F.Supp. at 152. In view of the dicta in *Perry* that "[a] state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with … § 2," 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9, 96 L.Ed.2d at 437, n. 9, the Massachusetts court could not but hold that the regulations were preempted by the FAA. The defendant in this case does not make this concession, and this Court has agreed, *supra*, that the statute here at issue does not single out arbitration agreements for especially burdensome treatment.

Furthermore, while this Court agrees that arbitration agreements may not be burdened with "conditions on [their] formation and execution … which are not part of the generally applicable contract law," *Connolly*, 703 F.Supp. at 153, it does not agree with the result reached by the Massachusetts court. Judge Woodlock, in holding that the regulations were preempted, stated that they "represent[ed] a radical departure from the treatment of contracts generally in the State's common law." *Id.* He acknowledged that "Massachusetts law does contain a variety of idiosyncratic statutory provisions which require special treatment of—and disclosure regarding—certain types of contractual provisions," but wrote these off as "the exceptions that prove the rule." *Id.* It appears that, underlying the holding in *Connolly* is the premise that the body of law governing the formation of contracts generally which may constitutionally be applied to arbitration agreements should be limited to the state's common law, unenhanced by statutory law. This Court does not take such a restricted view, but instead believes that this body of law should consist of all statutory and common law that governs the formation of contracts. This approach finds support in *Supak*, 593 F.2d 135, in which the Fourth Circuit held that Uniform Commercial Code provisions governing the formation of contracts applied to invalidate an arbitration clause.

Because § 46.1–550.5:27(10) does not single out arbitration agreements for special treatment, but rather forms an unexceptional part of the law of Virginia applicable to the formation of contracts, and because the effect that it has on arbitration agree-

ments does not "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the statute is not preempted by § 2 of the Federal Arbitration Act. The plaintiff's motion is DENIED, the defendant's and intervenor's motions are GRANTED, and judgment is entered in their favor.

It is so ORDERED.