December 18, 1978

# 78-98 MEMORANDUM OPINION FOR THE GENERAL COUNSEL, CENTRAL INTELLIGENCE AGENCY

## Supremacy Clause (Art. VI, cl. 2)—Central Intelligence Agency—Polygraph Examinations of Employee of CIA Contracts

Your Office has requested our views on State law that may bear on your Agency's administration of polygraph examinations of certain key employees of United States corporations having classified contracts with the Central Intelligence Agency (CIA).

### I.

Our discussion begins with the question whether the CIA is authorized as a matter of Federal law to administer polygraph examinations in order to protect adequately classified information from public disclosure.

Several provisions of law, of both general and particular applicability, support the CIA's authority. As a general matter, Executive Order No. 12065, 43 F.R. 28949 (June 28, 1978), reprinted in 50 U.S.C. § 401 Note (Supp. II 1978), requires Federal agencies to ensure the security of classified information. The pertinent provisions of that order provide:

> No person may be given access to classified information unless that person has been determined to be trustworthy and unless access is necessary for the performance of official duties.

(§ 4-101[1])

> Controls shall be established by each agency to ensure that classified information is used, processed, stored, reproduced, and transmitted only under conditions that will provide adequate protection and prevent access by unauthorized persons.

(§ 4-103)

---

[1] Information Security Oversight Office Directive No. 1 (approved September 29, 1978) issued pursuant to Executive Order No. 12065, §§ 5-202(d), 6-204, states that:

A person is eligible for access to classified information only after a showing of trustworthiness as determined by agency heads based upon appropriate investigations in accordance with applicable standards and criteria. (§ IV. B. 2.)

Agency heads listed in Section 1-201 may create special access programs to control access, distribution, and protection of particularly sensitive information classified pursuant to this Order or prior Orders.

(§ 4-201)

The order also mandates that "classified information disseminated outside the Executive branch shall be given protection equivalent to that afforded within the Executive branch." § 4-105. This provision, in conjunction with those above, appears to require security precautions in instances where classified information is to be given to the employees of CIA contractors.

Several other provisions of law are relevant. First, the Director of the CIA is made responsible by statute "for protecting intelligence sources and methods." 50 U.S.C. §§ 403(d)(3), 403g (1976). Second, Executive Order No. 12036, 43 F.R. 3674 (Jan. 26, 1978), reprinted in 50 U.S.C. § 401 Note (Supp. II 1978), requires the CIA to "protect the security of its installations, activities, information and personnel by appropriate means, including such investigations of applicants, employees, contractors, and other persons with similar associations with the CIA as are necessary." § 1-811. This provision as well as others in the order *(see* §§ 2-206(d), 2-208(c)), explicitly allows for investigations of those contractors handling sensitive information.

It seems evident that, on the basis of the foregoing authorities, the CIA is authorized and required to conduct investigations of its contractors' employees in order to ensure the security of classified information. In light of this duty and on the basis of information supplied by your Agency, the use of polygraph examinations is an authorized Federal function. Although there is no Federal law explicitly authorizing such a process, that lack cannot be deemed controlling. *See, United States* v. *Macdaniel,* 32 U.S. (7 Pet.) 1, 13-14 (1833). Where a statute imposes a duty, it authorizes by implication all reasonable and necessary means to effectuate the duty. *United States* v. *Jones,* 204 F. (2d) 745, 754 (7th Cir. 1953); *United States* v. *Kelly,* 55 F. (2d) 67 (2d Cir. 1932); 2A Sutherland, Statutes and Statutory Construction, § 55.04, at 384 (4th ed. 1973).[2] The use of polygraph tests, we are told, provides a means whereby information submitted by employees can be evaluated and verified with a view toward determining whether employees may be entrusted with classified information. We are also informed that this technique elicits information that could not otherwise be elicited, and, therefore, tightens security in a way which could not otherwise be done. In the view of the CIA, these factors make polygraph examinations an "extraordinarily useful device." On this basis, a polygraph examination can be seen as a reasonable and necessary means to the effectuation of duties imposed on the CIA under Federal law and, therefore, under the authorities cited above, its use is authorized.[3]

---

[2]The same general rule is set forth in Executive Order No. 12036, § 1-811, which authorizes "appropriate means" to protect security.

[3]We understand that those to be tested are knowingly performing work for the CIA, are informed of the CIA's involvement in the testing, and consent to it. That being the case, we do not believe that any problems arise under the prohibition on the CIA's performance of internal security or law enforcement functions. *see* 50 U.S.C. § 403(d)(3) (1976), even as that prohibition was interpreted

(Continued)

We believe, however, that a caveat is in order. Executive Order No. 12036, § 1-811, allows for "such investigations of . . . contractors . . . as are *necessary*." This requirement might be read to preclude the administration of polygraph tests on an undifferentiated basis to all employees of a contractor. Rather, some evaluation and determination as to the need with respect to a particular contractor's employees, or to certain classes of such employees, would appear to be more consonant with this provision. Since polygraph testing is apparently now being administered only to "key employees," who either have access to a great deal of classified information or have an unusually comprehensive knowledge of CIA projects, it appears that the need is taken into account.

## II.

Massachusetts has enacted the following statute:

> Any employer who subjects any person employed by him, or any person applying for employment, to a lie detector test, or causes, directly or indirectly, any such employee or applicant to take a lie detector test, shall be punished by a fine of not more than two hundred dollars. This section shall not apply to lie detector tests administered by law enforcement agencies in the performance of their official duties.

[Chapter 149, § 19B, Mass. Gen. Law]

One question is whether this statute may legitimately be applied to either the CIA itself or its contractor in Massachusetts. Your office believes that, by its own terms, the statute does not encompass CIA polygraph examinations. The interpretation of the statute is a function which must be performed by the appropriate State officials, although it is proper for you to urge on them your interpretation. We address here only the question of the validity of the statute, assuming that it does impinge on the performance of a Federal function. For the reasons that follow, we believe that Massachusetts may not apply the statute to either the CIA or its contractors.

### A.

It is a fundamental principle of Federal constitutional law that, by reason of the Supremacy Clause, Article VI, cl. 2, the legitimate activities of the Federal Government may not be impeded by a State. *Mayo* v. *United States*, 319 U.S. 441, 445 (1943). We thus do not believe that Massachusetts can prohibit the CIA from conducting polygraph examinations the CIA is authorized to conduct under Federal law.

Concededly, the situation here is different from the usual Supremacy Clause question. In the ordinary case, courts are called upon to review State laws that conflict with a Federal statute or regulation. Although the Director's authorization of polygraph examinations does not, in terms, proceed from statute or

---

(Continued)

in *Weissman* v. *CIA*, 565 F. (2d) 692 (D.C. Cir. 1977). Nor are we aware of any other general prohibition, in either a statute or Executive order, on the use of polygraph testing by intelligence agencies.

regulation, we do not believe that this is of any real consequence. It is not the abstract inconsistency between the express terms of State and Federal law which is the concern underlying the Supremacy Clause. *Cf., Los Alamos School Board* v. *Wugalter*, 557 F. (2d) 709, 714 (10th Cir. 1977) (potential or peripheral conflicts between State and Federal law will not render a State law invalid). Rather, the evil that the clause addresses is obstruction to the accomplishment and execution of lawful Federal purposes and objectives. *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941). This may occur not only when State law conflicts with the express terms of the Federal law, but also when State law impedes the performance of activities conducted under the authority of Federal law. *See, United States* v. *Public Service Commission*, 422 F. Supp. 676 (D. Md. 1976) (three-judge court) (authority of the General Services Administration to conduct cross-examinations in State utility rate proceedings beyond time limit imposed by the State); *In Re New York State Sales Tax Records*, 382 F. Supp. 1205 (W.D. N.Y. 1974) (exercise of grand jury powers prevails over state nondisclosure law); *see also, United States* v. *City of Chester*, 144 F. (2d) 415, 420 (3rd Cir. 1944). Since we have concluded that the administration of polygraph examinations is an activity authorized by Federal law, we do not believe that it may be impeded by State law.

We recognize that, in certain circumstances, State law applies to, and controls, the exercise of various Federal functions. [This obtains, however, only where the application of State law would not undermine those functions.] *Mayo* v. *United States, supra,* at 446. We are informed that the application of the statute to the CIA would result in its inability to perform satisfactory security checks, and this in turn would substantially impair its procurement operations. On this basis, we do not believe that the above rationale justifies application of the Massachusetts statute.

The Supremacy Clause question often becomes one of assessing congressional intent, *i.e.,* whether in the statutes under which the Executive branch is implementing some regulation or program, Congress intended Federal action to override inconsistent State laws. In some instances an examination of the legislative history and the structure of a statute reveals that Congress did not intend to interfere with State regulation. Where, however, there is a clear conflict between the implementation of a legitimate Federal function and a State law, and there is no evidence that Congress contemplated that the Federal interest would be subordinated, the State enactment must yield. We believe that conflict to exist here.

### III.

The question remains whether, even though the Massachusetts statute may not be applied to the CIA itself, it is applicable to the CIA's contractor. We reiterate that we express no views as to the interpretation of the statute insofar as the CIA's contractor is generally concerned. Rather, we discuss only whether the statute may legitimately be applied to the contractor in connection with its work for the CIA.

This question does not admit of an easy answer. It is clear that the mere fact that a particular entity is performing work for the Federal Government does not exempt it altogether from State regulation. *Railway Mail Association* v. *Corsi*, 326 U.S. 88, 95-96 (1945) (applying State nondiscrimination law to postal

union); *Stewart and Co. v. Sandrakula*, 309 U.S. 94 (1940) (State safety requirement applicable to Federal contractor); *Public Housing Administration v. Bristol Township*, 146 F. Supp. 859 (E.D. Pa. 1956) (Federal contractor required to adhere to building code requirements). On the other hand, it also seems clear that a company's performance of work for the Federal Government may at times exempt it from State or local regulation. *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *Pacific Coast Dairy v. Department of Agriculture of California*, 318 U.S. 285 (1943); *Contractors Association of Eastern Pennsylvania v. Secretary of Labor*, 442 F. (2d) 159, 166 (3rd Cir. 1971).

The approach the courts take in assessing the application of State statutes imposing burdens on Federal contractors is much the same as their approach with regard to statutes imposing burdens on the Federal Government itself. That is, the courts look to whether the statute would frustrate the operation of Federal functions. *Railway Mail Association v. Corsi, supra*, at 95-96; *Leslie Miller, Inc. v. Arkansas, supra*, at 190; *Steward and Co. v. Sandrakula, supra*, at 103-04. Under this standard, the application of the Massachusetts law to the contractor would frustrate Federal functions to the same extent as if the law were to apply to the CIA itself. According to the CIA, such an application would inevitably result in the contractor's refusal to allow his employees to take part in the polygraph examination program, which, in turn, would result in less than adequate security and ultimately would jeopardize CIA procurement. In our opinion, the decisions under the Supremacy Clause would not allow State law to cause this sort of disruption of a Federal program, even if the State law is being applied only to a contractor.

## IV.

For the foregoing reasons, we do not believe that the Massachusetts law in question may legitimately be applied to either the CIA or its contractors so as to preclude authorized polygraph examinations. However, a word of caution is appropriate. The application of State law to Federal contractors is generally dependent on the particular facts and circumstances; *see, Mayo v. United States*, 319 U.S., at 447-448; *Los Alamos School Board v. Wugalter*, 557 F. (2d), at 712, 714. This is a question which necessarily entails a judgment predicated on any number of different factors. Moreover, as the considerable volume of case law in the State-Federal conflict area demonstrates, disputes of this type often result in litigation and resolution pursuant to standards that are often difficult to apply with precision. It is, therefore, an area in which prelitigation predictions should be cautious.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
