NASHOBA COMMUNICATIONS LIMITED PARTNERSHIP NO. 7, d/b/a Nashoba Cable Services, Plaintiff,

v.

TOWN OF DANVERS, et al., Defendants.

Civ. A. No. 88–1743–C.

United States District Court, D. Massachusetts.

Dec. 30, 1988.

Gene K. Landy, Jarvis P. Kellogg, Widett & Slater & Goldman, Boston, Mass., R. Stephen Berry, Fleischman & Walsh, P.C., Washington, D.C., for plaintiff.

Paul L. Kenny, David J. Doneski, Francis P. McHugh, Danvers, Mass., for defendants.

## MEMORANDUM

CAFFREY, Senior District Judge.

On March 12, 1985, Nashoba Communications Limited Partnership No. 7, doing business as Nashoba Cable Services ("Nashoba"), and the Town of Danvers ("Danvers" or "the Town") executed a License Agreement wherein Nashoba agreed to construct a cable television system and provide cable services to the Town. As part of the application process, Nashoba agreed to freeze its basic service rates for the first two years of operation. Danvers subscribers were first able to receive the new cable service in July 1986. In June 1988, Nashoba notified Danvers residents and the Danvers Board of Selectmen that, effective August 1, 1988, it would combine the Economy Basic and Super Basic service levels and increase the rates for the two basic services from $4.00 and $9.95 monthly, respectively, to the single rate of $12.95 monthly. Rates for other levels of service and installation and equipment costs would also increase. The litigation scramble then began.

After receiving notice of the rate increase, Danvers notified Nashoba that Danvers considered the rate increase a violation of the License Agreement and threatened legal action if Nashoba implemented the proposed rate hike. Nashoba beat Danvers to the punch and filed its complaint against the Town in this Court in July 1988. Nashoba seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, equitable relief in the form of both a temporary and a permanent injunction against the Town, and appropriate damages, costs, and attorneys' fees.

Danvers moved to dismiss Nashoba's complaint on essentially two grounds: that this Court lacks subject matter jurisdiction over the dispute, and that Nashoba has failed to state a claim upon which relief can be granted. Nashoba then moved for partial summary judgment on Count One of its complaint, concerning possible federal preemption of any rate regulation by Danvers. Danvers opposes this motion. Because we find that an actual case or controversy exists in the matter before us, Danvers' motion to dismiss for want of jurisdiction and ripeness should be denied. We proceed to the issues at hand.

### 1. *The Threshold Issues*

■ As a threshold matter, Danvers argues that no live case or controversy exists in the case at bar. Nashoba has threatened to increase its rates, Danvers has threatened legal action, but neither Nashoba nor Danvers has acted on these threats. The question before the Court, therefore, is whether Nashoba has suffered any actual harm that properly gives us jurisdiction over this dispute.

Ripeness issues can be difficult, especially when they appear, as here, in conjunction with the Declaratory Judgment Act. While it is clear that the Declaratory Judgment Act does not create jurisdiction where it would not otherwise exist under Article III of the Constitution, *Public Serv. Comm'n v. Wycoff,* 344 U.S. 237, 242–43, 73 S.Ct. 236, 239–40, 97 L.Ed. 291 (1952), it is not always clear whether a controversy has ripened sufficiently for adjudication.

In a dispute factually similar to the case at bar, the U.S. District Court of Maine recently repeated the ripeness rule: "To state a true case or controversy plaintiff must allege an actual or threatened injury which is real and immediate[,] not conjectural or hypothetical." *Pehrson v. Concannon,* 607 F.Supp. 589, 592 (D.Me.1985) (citing *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)). We find that the following letter, sent to Nashoba by Danvers town counsel, threatens real and immediate injury:

I am also recommending the Board of Selectmen, by copy of this letter, that

they impose whatever penalties or sanctions are appropriate, under the terms of this license, including but not limited, to assessments against the letter of credit where appropriate. I am also recommending that failing to hear from you concerning withdrawal of the rate increase, that the Selectmen direct my office to initiate litigation seeking an injunction against such increase.

Plaintiff's Complaint, Exhibit D. If "the test is one of realistic danger to the plaintiff," *McCollester v. City of Keene,* 668 F.2d 617, 618–19 n. 4 (1st Cir.1982), Nashoba clearly has demonstrated appropriate danger. This controversy is ripe for resolution.

■ Danvers also raises the threshold issue of whether this Court has subject matter jurisdiction over Nashoba's complaint. Because we find that this action arises under federal law, as the following section explains, there is no need to address Danvers' arguments concerning the well-pleaded complaint rule. In this action Nashoba is not anticipating a federal law defense to its state law claims; rather, Nashoba is asserting its rights under federal law. *Centel Cable Television Co. v. Admiral's Cove Assoc.,* 835 F.2d 1359 (11th Cir.1988). Danvers' motion to dismiss on these grounds should, therefore, be denied.

### 2. *The Cable Communications Policy Act of 1984*

■ While Nashoba and Danvers were negotiating the details of their License Agreement, the United States Congress enacted the Cable Communications Policy Act of 1984 ("the Act"), codified at 47 U.S.C. §§ 521 *et seq.* The purpose of this comprehensive statute, which took effect on December 29, 1984, was to

establish a national policy concerning cable communications; ... establish guidelines for the exercise of Federal, State, and local authority with respect to the regulation of cable systems; ... [and] promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems.

47 U.S.C. § 521. In order to achieve these goals, the Act specifically limits the regulatory powers of franchising authorities, such as the Town of Danvers. Section 543 provides that

> [a]ny Federal agency or State *may not* regulate rates for the provision of cable service except to the extent provided under this section. Any franchising authority may regulate the rates for the provision of cable service ... *but only* to the extent provided under this section.

47 U.S.C. § 543 (emphasis supplied). The statute establishes the two circumstances under which rate regulation is permissible: 1) when the cable system is not subject to "effective competition," defined as when three unduplicated television signals serve the cable community, 47 C.F.R. § 76.33(2); and 2) when the franchise was granted on or before the effective date of the Act, that is, December 29, 1984 (this provision is known as the Act's "grandfather clause"). This is the full extent of rate regulation permitted franchising authorities by law, and these are the exclusive parameters within which Nashoba may seek rate increases. The Act clearly " 'deregulates' insofar as rates are concerned." *Burlington v. Mountain Cable Co.*, No. S 1190–86, slip op. at 8 (Super.Ct.Vt. Dec. 31, 1986), *aff'd*, No. 87–156 (Sup.Ct.Vt. Nov. 10, 1988).

Danvers advances the interesting, but, in the final analysis meritless, argument that the Cable Communications Policy Act of 1984 does not apply to the case at bar. Danvers seeks to characterize this matter as simply a common-law contract dispute, governed by state law. As the Cable Communications Policy Act comes of age, we can envision many disputes, like this one, concerning the interplay of state and federal law and the rights of the various parties under the Act. These issues have not been addressed conclusively in this and most other circuits, partly because the Act is still quite young, and partly because of its mixture of "preemption and preservation." See *Housatonic Cable Vision Co. v. Department of Pub. Util. Control*, 622 F.Supp. 798, 802 (D.Conn.1985), for an excellent discussion of the interpretive problems posed by the Act. We remain cognizant that Congress clearly intended, through the Act, to establish a national policy governing the provision of cable television services to subscribers. Thus we look to the decisional law of other federal courts and the state courts that have considered these issues in order to act in harmony with them, where possible.

### 3. The Pre–Emption Argument

Does the Cable Communications Policy Act of 1984 pre-empt any action by Danvers, the franchising authority, to regulate Nashoba's rates? Based on our reading of the statute, the parties' pleadings, and the parties' oral arguments before this Court at the hearing on these motions, the answer must be yes. The basic and well-settled principles of federal pre-emption under the Supremacy Clause of the Constitution govern our consideration of this issue. When Congress has enacted a comprehensive statute regulating an area of national concern, or so occupies the field in a given area, a court may infer Congressional intent to pre-empt any state law or regulation in that area. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963) ("A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility...."); *Hines v. Davidowitz*, 312 U.S. 52, 66–67, 61 S.Ct. 399, 403–404, 85 L.Ed. 581 (1941) ("And where the federal government, in the exercise of its superior authority in this field, has enacted a complete scheme of regulation ... states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations.").

We find that the Cable Communications Policy Act of 1984 is such a comprehensive and field-occupying statute, and that rate regulation is one of its special concerns. Congress apparently intended to prevent a crazy-quilt patchwork of local rate regula-

tion and instead intended to subject cable television rates to the competition of the marketplace. *Centel Cable,* 835 F.2d at 1363. Congress determined that this approach would be the most beneficial for all the parties involved, including the subscriber, the cable company, and the local community. *Tribune–United Cable v. Montgomery County,* 784 F.2d 1227, 1231 (5th Cir.1986) ("The purpose and thrust of the Act ... evince a congressional desire that franchise agreements be applied and modified so as to obtain a realistic and flexible regulatory framework recognizing the needs of both local governments and cable operators, but primarily concerned with providing viable cable systems responsive to the needs and interests of the local communities they serve. Congress ... recognized that cable operators compete in a changing marketplace.").

The Danvers rate freeze is precisely the sort of rate regulation the Act prohibits. There is no question that the Act applies to the License Agreement executed by Nashoba and Danvers, as that Agreement postdates the effective date of the Act. Section 543 therefore controls, and its language is clear: after December 29, 1986, only cable systems *not* subject to effective competition may be regulated by the franchising authority. The facts in the case at bar are uncontroverted—Nashoba is subject to effective competition under the statute. Danvers cannot regulate Nashoba's rates.

■ Danvers argues that a rate "freeze" is not rate "regulation" within the meaning of the statute and regulations. We do not construe the meaning of the word "regulation" so narrowly. The plain meaning of "regulation" ("an authoritative rule dealing with details or procedure ... a rule or order having the force of law issued by an executive authority of a government," Webster's New Collegiate Dictionary (1977)) clearly encompasses the concept of a freeze, for a freeze affects Nashoba's ability to raise its rates just as a less intrusive regulation might. And a freeze need not take the form of an official enactment or by-law in order to constitute a regulation. The rate freeze at issue in this case became an "authoritative rule" when it was incorporated into the License Agreement executed by the parties.

■ Danvers also argues that Nashoba waived its statutory right to raise its rates when it executed the License Agreement. To support this argument, Danvers cites the following passage in the preliminary "Questions for Applicants" form which Nashoba completed as part of the application process with the Town:

Will the applicant honor a rate freeze for a minimum of the first two years of operation, commencing with the date that service is available to the entire Town? Nashoba will guarantee our proposed installation, Economy Basic and Super Basic service rates for a period of two years from the time of completion of the initial phase of construction.

Plaintiff's Complaint, Exhibit E. Danvers asserts that this statement, incorporated by reference into the final License Agreement, constitutes Nashoba's waiver of its statutory right to raise rates.

Public policy concerns, particularly in the context of a comprehensive federal statute such as the Cable Communications Policy Act of 1984, militate against permitting a cable services provider to waive key provisions in the statute. *City of Dubuque v. Group W Cable,* No. C 85–1046 (D. Iowa June 18, 1986) (1986 WESTLAW 15646) ("The general rule appears to be that a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy ... By the very language of the Act it is clear that Congress intended to pre-empt local franchises and create a uniform national policy. To uphold waivers of that national policy would directly contravene the intent of Congress."). But this argument, as well as the freeze versus regulation argument above, are essentially irrelevant. Both arguments are based on the premise that Nashoba has somehow violated its contract with Danvers. Because Danvers has presented no evidence of this purported breach beyond its bare allegations, not even the favorable light reading

we are required by law to give Danvers' pleadings can save this claim. *Emery v. Merrimack Valley Wood Prod., Inc.*, 701 F.2d 985, 986 (1st Cir.1983).

■ Nashoba agreed to freeze its rates for "a period of two years from the time of completion of the initial phase of construction." Beyond the conclusory and repetitive statements that "[t]he commencement of that two year period is disputed between the parties," and "Danvers disputes that the proper two year period was observed," Danvers has presented no evidence of this alleged dispute. In view of Nashoba's uncontroverted evidence that it completed the initial phase of construction in July 1986, we find that the agreed-upon two-year rate freeze was in effect only until July 31, 1988. We find no evidence that Nashoba has breached its contract with Danvers. Summary judgment for Nashoba on Count One of its complaint should, therefore, be allowed.

### 4. *Appropriate Relief*

Nashoba has requested a wide spectrum of damages, ranging from declaratory and injunctive relief to monetary damages and attorneys' fees. Pursuant to 28 U.S.C. § 2201, this Court clearly has authority to order declaratory relief. As the analysis above has shown, Danvers' threatened rate regulation is prohibited by the Cable Communications Policy Act of 1984, and Nashoba has not violated the License Agreement in seeking to raise its rates as of August 1, 1988.

■ Since we have determined that Nashoba may legally raise its rates, the next question is how to effectuate this rate increase without engaging in impermissible rate regulation. Nashoba has not made any specific requests, nor has it presented any evidence concerning any monetary damages it may be suffering now while rates remain at the 1986 level. In balancing the equities between subscribers and Nashoba and treading lightly on this new ground, we believe the rate increase should be prospective rather than retroactive. It is possible that many subscribers to the old $4.00 Economy Basic service level may not be able to afford the new

$12.95 basic service, and these, as well as other subscribers, should not bear the brunt of a retroactive rate increase. We therefore find that Nashoba may increase its rates as detailed in its June 24, 1988 letter to subscribers, thirty (30) days from the issuance of this memorandum. Timely notice of the increases should be provided all subscribers once again.

Nashoba has also requested injunctive relief, monetary damages, and attorneys' fees and costs. We see no reason to temporarily or permanently enjoin the Town of Danvers in this matter and expect that town counsel and the Board of Selectmen will abide by the terms of this memorandum. We also see no need to award damages or attorneys' fees. The Cable Communications Policy Act of 1984 contains no provisions authorizing these types of damages.

### ORDER

In accordance with memorandum filed this date, it is ORDERED:

1. The plaintiff's motion for partial summary judgment is allowed.

2. The plaintiff's motion for declaratory relief is allowed.

3. The plaintiff's motion for injunctive relief, damages, and attorneys' fees is denied.

4. The defendants' motion to dismiss is denied.