Justice Breyer,
with whom Justice Ginsburg joins, dissenting.
The federal Immigration Reform and Control Act of 1986 (Act or IRCA) pre-empts “any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.” 8 U. S. C. § 1324a(h)(2). The state law before us, the Legal Arizona *612 Workers Act, imposes civil sanctions upon those who employ unauthorized aliens. See Ariz. Rev. Stat. Ann. §23-211 et seq. (West Supp. 2010). Thus the state law falls within the federal Act’s general pre-emption rule and is preempted — unless it also falls within that rule’s exception for “licensing and similar laws.” Unlike the Court, I do not believe the state law falls within this exception, and I consequently would hold it pre-empted.
Arizona calls its state statute a “licensing law,” and the statute uses the word “licensing.” But the statute strays beyond the bounds of the federal licensing exception, for it defines “license” to include articles of incorporation and partnership certificates, indeed virtually every state-law authorization for any firm, corporation, or partnership to do business in the State. § 23-21 l(9)(a); cf. §23-211(9)(c) (excepting professional licenses, and water and environmental permits). Congress did not intend its “licensing” language to create so broad an exemption, for doing so would permit States to eviscerate the federal Act’s pre-emption provision, indeed to subvert the Act itself, by undermining Congress’ efforts (1) to protect lawful workers from national-origin-based discrimination and (2) to protect lawful employers against erroneous prosecution or punishment.
Dictionary definitions of the word “licensing” are, as the majority points out, broad enough to include virtually any permission that the State chooses to call a “license.” See ante, at 595 (relying on a dictionary and the federal Administrative Procedure Act). But neither dictionary definitions nor the use of the word “license” in an unrelated statute can demonstrate what scope Congress intended the word “licensing” to have as it used that word in this federal statute. Instead, statutory context must ultimately determine the word’s coverage. Context tells a driver that he cannot produce a partnership certificate when a policeman stops the car and asks for a license. Context tells all of us that “licensing” as used in the Act does not include marriage li *613 censes or the licensing of domestic animals. And context, which includes statutory purposes, language, and history, tells us that the federal statute’s “licensing” language does not embrace Arizona’s overly broad definition of that term. That is to say, ordinary corporate charters, certificates of partnership, and the like do not fall within the scope of the word “licensing” as used in this federal exception. See Dolan v. Postal Service, 546 U. S. 481, 486 (2006) (statutory interpretation requires courts to “rea[d] the whole statutory text, considefr] the purpose and context of the statute, and consult] any precedents or authorities that inform the analysis”); United States v. Heirs of Boisdoré, 8 How. 113, 122 (1849) (similar).
I
To understand how the majority’s interpretation of the word “licensing” subverts the Act, one must understand the basic purposes of the pre-emption provision and of the Act itself. Ordinarily, an express pre-emption provision in a federal statute indicates a particular congressional interest in preventing States from enacting laws that might interfere with Congress’ statutory objectives. See International Paper Co. v. Ouellette, 479 U. S. 481, 494 (1987). The majority’s reading of the provision’s “licensing” exception, however, does the opposite. It facilitates the creation of “ ‘obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress.’” Crosby v. National Foreign Trade Council, 530 U. S. 363, 373 (2000) (quoting Hines v. Davidowitz, 312 U. S. 52, 67 (1941)).
A
Essentially, the federal Act requires employers to verify the work eligibility of their employees. And in doing so, the Act balances three competing goals. First, it seeks to discourage American employers from hiring aliens not authorized to work in the United States. H. R. Rep. No. 99-682, pt. 1, p. 56 (1986).
*614 Second, Congress wished to avoid “placing an undue burden on employers,” id., at 90, and the Act seeks to prevent the “harassment” of “innocent employers,” S. Rep. No. 99-132, p. 35 (1985).
Third, the Act seeks to prevent employers from disfavoring job applicants who appear foreign. Reiterating longstanding antidiscrimination concerns, the House Committee Report explained:
“Numerous witnesses ... have expressed their deep concern that the imposition of employer sanctions will cause extensive employment discrimination against Hispanic-Americans and other minority group members. These witnesses are genuinely concerned that employers, faced with the possibility of civil and criminal penalties, will be extremely reluctant to hire persons because of their linguistic or physical characteristics.” H. R. Rep. No. 99-682, at 68.
See also 42 U. S. C. § 2000e-2(a)(l) (making it an “unlawful employment practice” for an employer to discriminate against an individual “because of such individual’s race, color, religion, sex, or national origin”); U. S. Commission on Civil Rights, The Tarnished Golden Door: Civil Rights Issues in Immigration 74 (1980) (finding that “increased employment discrimination against United States citizens and legal residents who are racially and culturally identifiable with major immigrant groups could be the unintended result of an employer sanctions law”). The Committee concluded that “every effort must be taken to minimize the potentiality of discrimination.” H. R. Rep. No. 99-682, at 68.
B
The Act reconciles these competing objectives in several ways:
First, the Act prohibits employers from hiring an alien knowing that the alien is unauthorized to work in the United States. 8 U. S. C. § 1324a(a)(l)(A). *615 Second, the Act provides an easy-to-use mechanism that will allow employers to determine legality: the 1-9 form. In completing an 1-9 form, the employer certifies that he or she has examined one or two documents (e. g., a passport, or a driver’s license along with a Social Security card) that tend to confirm the worker’s identity and employability. § 1324a(b)(l). Completion of the form in good faith immunizes the employer from liability, even if the worker turns out to be unauthorized. §§ 1324a(a)(3), 1324a(b)(6).
A later amendment to the law also allows an employer to verify an employee’s work eligibility through an Internet-based federal system called E-Verify. If the employer does so, he or she will receive the benefit of a rebuttable presumption of compliance. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), § 402(b), 110 Stat. 3009-656 to 3009-657, note following 8 U. S. C. § 1324a, p. 331 (Pilot Programs for Employment Eligibility Confirmation).
Third, the Act creates a central enforcement mechanism. The Act directs the Attorney General to establish a single set of procedures for receiving complaints, investigating those complaints that “have a substantial probability of validity,” and prosecuting violations. 8 U. S. C. § 1324a(e)(l). The relevant immigration officials and administrative law judges have the power to access necessary evidence and witnesses, § 1324a(e)(2), and the employer has the right to seek discovery from the Federal Government, 28 CFR §68.18 (2010). The employer also has the right to administrative and judicial review of the administrative law judge’s decision. §§68.54, 68.56.
Fourth, the Act makes it “an unfair immigration-related employment practice ... to discriminate against any individual” in respect to employment “because of such individual’s national origin.” 8 U. S. C. § 1324b(a).
Fifth, the Act sets forth a carefully calibrated sanction system. The penalties for hiring unauthorized aliens are graduated to prevent the Act from unduly burdening em *616 ployers who are not serious offenders. As adjusted for inflation, civil penalties for a first violation of the employment restrictions range from $375-$3,200 per worker, and rise to $3,200-$16,000 per worker for repeat offenders. § 1324a(e) (4)(A); 73 Fed. Reg. 10133 (2008); see also § 1324a(f) (imposing criminal fines of not more than $3,000 per worker and imprisonment for up to six months for “pattern or practice” violators of employment restrictions).
As importantly, the Act limits or removes any incentive to discriminate on the basis of national origin by setting antidiscrimination fines at equivalent levels: $37'5-$3,200 per worker for first-time offenders, and $3,200-$16,000 per worker for repeat offenders. § 1324b(g)(2)(B)(iv); 73 Fed. Reg. 10134. The Act then ties its unlawful employment and antidiscrimination provisions together by providing that, should the antihiring provisions terminate, the antidiscrimination provisions will also terminate, § 1324b(k), “the justification for them having been removed,” H. R. Conf. Rep. No. 99-1000, p. 87 (1986).
C
Now, compare and contrast Arizona’s statute. As I have said, that statute applies to virtually all business-related licenses, other than professional licenses. Ariz. Rev. Stat. Ann. §23-211(9). Like the federal Act, the state law forbids the employment of unauthorized aliens. §§23-212(A), 23-212.01(A). It also provides employers with somewhat similar defenses. §§23-212(I)~(J), 23-212.01(I)-(J). But thereafter the state and federal laws part company.
First, the state statute seriously threatens the federal Act’s antidiscriminatory objectives by radically skewing the relevant penalties. For example, in the absence of the Arizona statute, an Arizona employer who intentionally hires an unauthorized alien for the second time would risk a maximum penalty of $6,500. 8 U. S. C. § 1324a(e)(4)(A)(ii); 73 Fed. Reg. 10133. But the Arizona statute subjects that same employer (in respect to the same two incidents) to *617 mandatory, permanent loss of the right to do business in Arizona — a penalty that Arizona’s Governor has called the “business death penalty.” Ariz. Rev. Stat. Ann. §23-212.01(F)(2); News Release, Governor Signs Employer Sanctions Bill (2007), App. 399. At the same time, the state law leaves the other side of the punishment balance — the antidiscrimination side — unchanged.
This is no idle concern. Despite the federal Act’s efforts to prevent discriminatory practices, there is evidence that four years after it had become law, discrimination was a serious problem. In 1990, the/General Accounting Office identified “widespread discrimination ... as a result of” the Act. Report to the Congress, Immigration Reform: Employer Sanctions and the Question of Discrimination 3, 37, 80. Sixteen percent of employers in Los Angeles admitted that they applied the 1-9 requirement “only to foreign-looking or foreign-sounding persons,” and 22 percent of Texas employers reported that they “began a practice to (1) hire only persons born in the United States or (2) not hire persons with temporary work eligibility documents” because of the Act. Id., at 41-43. If even the federal Act (with its carefully balanced penalties) can result in some employers discriminating, how will employers behave when erring on the side of discrimination leads only to relatively small fines, while erring on the side of hiring unauthorized workers leads to the “business death penalty”?
Second, Arizona’s law subjects lawful employers to increased burdens and risks of erroneous prosecution. In addition to the Arizona law’s severely burdensome sanctions, the law’s procedures create enforcement risks not present in the federal system. The federal Act creates one centralized enforcement scheme, run by officials versed in immigration law and with access to the relevant federal documents. The upshot is an increased likelihood that federal officials (or the employer) will discover whether adverse information flows from an error-prone source and that they will proceed ac *618 cordingly, thereby diminishing the likelihood that burdensome proceedings and liability reflect documentary mistakes.
Contrast the enforcement system that Arizona’s statute creates. Any citizen of the State can complain (anonymously or otherwise) to the state attorney general (or any county attorney), who then “shall investigate,” Ariz. Rev. Stat. Ann. §23-212(B) (emphasis added), and upon a determination that the “complaint is not false and frivolous .. . shall notify the appropriate county attorney to bring an action,” §23-212(0(3). This mandatory language, the lower standard (“not frivolous” instead of “substantial”), and the removal of immigration officials from the state screening process (substituting numerous, elected county attorneys) increase the likelihood that suspicious circumstances will lead to prosecutions and liability of employers — even where more careful investigation would have revealed that there was no violation.
Again, this matter is far from trivial. Studies of one important source of Government information — the E-Verify system — describe how the federal administrative process corrected that system’s tentative “unemployable” indications 18 percent of the time. This substantial error rate is not a function of a small sample size. See ante, at 610, n. 12. Rather, data from one fiscal year showed 46,921 workers initially rejected but later “confirmed as work authorized”— all while E-Verify was used by only a fraction of the Nation’s employers. U. S. Citizenship and Immigration Services, Statistics and Reports, http://www.uscis.gov/portal/ Site/uscis/menuitem.ebld4c2a3e5b9ac89243c6a7543f6dla/ ?vgnextchannel=7 c579589cdb76210V gnV CM100000b92ca60aRCRD (Feb. 4, 2011) (as visited May 18, 2011, and available in Clerk of Court’s case file). That is to say nearly one in five times that the E-Verify system suggested that an individual was not lawfully employable (i. e., returned a tentative nonconfirmation of work authorization), the system was wrong; and subsequent review in the federal administrative process de *619 termined as much. (And those wrongly identified were likely to be persons of foreign, rather than domestic, origin, by a ratio of approximately-20 to 1.) See Westat, Findings of the E-Verify® Program Evaluation xxxi, 210, 246 (Dec. 2009) (assessing data from April to June 2008). E-Verify’s accuracy rate is even worse “in states that require the use of E-Verify for all or some of their employees.” Id., at 122.
A related provision of the state law aggravates the risk of erroneous prosecutions. The state statute says that in “determining whether an employee is an unauthorized alien, the court shall consider only the federal government’s determination pursuant to 8 [U. S. C.] § 1373(c).” Ariz. Rev. Stat. Ann. §23-212(H). But the federal provision to which the state law refers, 8 U. S. C. § 1373(c), says only that the Federal Government, upon a State’s request, shall verify a person’s “citizenship or immigration status.” It says nothing about work authorization. See post, at 637-639 (Soto-MAYOR, J., dissenting). It says nothing about the source of the Federal Government’s information. It imposes no duty upon the Federal Government or anyone else to investigate the validity of that information, which may falsely implicate an employer 18 percent of the time.
So what is the employer to do? What statute gives an employer whom the State proceeds against in state court the right to conduct discovery against the Federal Government? The Arizona statute, like the federal statute, says that the employer’s use of an 1-9 form provides a defense. But there is a hitch. The federal Act says that neither the 1-9 form, nor “any information contained in or appended to” the form, “may ... be used for purposes other than for enforcement of this” federal Act. § 1324a(b)(5). So how can the employer present a defense, say, that the Government’s information base is flawed? The plurality takes the view that the forms are not necessary to receive the benefit of the affirmative defense. Ante, at 603, n. 9. But the 1-9 form would surely be the employer’s most effective evidence. See also post, at *620 640 (Sotomayor, J., dissenting) (suggesting that the unavailability of 1-9 forms to defend against state-court charges means that Congress “intended no such” proceedings).
Nor does the Arizona statute facilitate the presentation of a defense when it immediately follows (1) its statement that “the court shall consider only the federal government’s determination” when it considers “whether an employee is an unauthorized alien” with (2) its statement that “[t]he federal government’s determination creates a rebuttable presumption of the employee’s lawful status.” Ariz. Rev. Stat. Ann. §23-212(H) (emphasis added). The two statements sound as if they mean that a Federal Government determination that the worker is unlawful is conclusive against the employer, but its determination that the worker’s employment is lawful is subject to rebuttal by the State. Arizona tells us that the statute means the opposite. See ante, at '601, n. 7. But the legal briefs of. Arizona’s attorney general do not bind the state courts. And until the matter is cleared up, employers, despite 1-9 checks, despite efforts to use E-Verify, will hesitate to hire those they fear will turn out to lack the right to work in the United States.
And that is my basic point. Either directly or through the uncertainty that it creates, the Arizona statute will impose additional burdens upon lawful employers and consequently lead those employers to erect ever stronger safeguards against the hiring of unauthorized aliens — without counterbalancing protection against unlawful discrimination. And by defining “licensing” so broadly, by bringing nearly all businesses within its scope, Arizona’s statute creates these effects statewide.
Why would Congress, after deliberately limiting ordinary penalties to the range of a few thousand dollars per illegal worker, want to permit far more drastic state penalties that would directly and mandatorily destroy entire businesses? Why would Congress, after carefully balancing sanctions to avoid encouraging discrimination, want to allow States to *621 destroy that balance? Why would Congress, after creating detailed procedural protections for employers, want to allow States to- undermine them? Why would Congress want to write into an express pre-emption provision — a provision designed to prevent States from undercutting federal statutory objectives — an exception that could so easily destabilize its efforts? The answer to these questions is that Congress would not have wanted to do any of these things. And that fact indicates that the majority’s reading of the licensing exception — a reading that would allow what Congress sought to forbid — is wrong.
II
The federal licensing exception cannot apply to a state statute that, like Arizona’s statute, seeks to bring virtually all articles of incorporation and- partnership certificates within its scope. I would find the scope of the exception to federal pre-emption to be far more limited. Context, purpose, and history make clear that the “licensing and similar laws” at issue involve employment-related licensing systems.
The issuance of articles of incorporation and partnership certificates and the like have long had little or nothing to do with hiring or “employment.” Indeed, Arizona provides no evidence that any State, at the time the federal Act was enacted, had refused to grant or had revoked, say, partnership certificates, in light of the partners’ hiring practices of any kind, much less the hiring of unauthorized aliens. See Ariz. Rev. Stat. Ann. § 29-308 (limited partnership formed upon the filing of a certificate of partnership providing names and addresses); § 29-345 (providing for dissolution of a limited partnership “[o]n application by or for a partner or assignee . . . whenever it is not reasonably practicable to carry on the business in conformity with the partnership agreement”).
To read the exception as covering laws governing corporate charters and partnership certificates (which are not *622 usually called “licensing” laws) is to permit States to turn virtually every permission-related state law into an employment-related “licensing” law. The State need only call the permission a “license” and revoke the license should its holder hire an unauthorized alien. If what was not previously an employment-related licensing law can become one simply by using it as a sanction for hiring unauthorized aliens or simply by state definition, indeed, if the State can call a corporate charter an employment-related licensing law, then why not an auto licensing law (amended to revoke the driver’s licenses of those who hire unauthorized aliens)? Why not a dog licensing law? Or why not “impute” a newly required license to conduct any business to every human being in the State, withdrawing that license should that individual hire an unauthorized alien? See S. C. Code Ann. §41-8-20 (Supp. 2010) (providing that “[a]ll private employers in South Carolina .. . shall be imputed a South Carolina employment license, which permits a private employer to employ a person in this State,” but conditioning the license on the company’s not hiring unauthorized aliens).
Such laws might prove more effective in stopping the hiring of unauthorized aliens. But they are unlikely to do so consistent with Congress’ other critically important goals, in particular, Congress’ efforts to protect from discrimination legal workers who look or sound foreign. That is why we should read the federal exemption’s “licensing” laws as limited to those that involve the kind of licensing that, in the absence of this general state statute, would nonetheless have some significant relation to employment or hiring practices. Otherwise we read the federal “licensing” exception as authorizing a State to undermine, if not to swallow up, the federal pre-emption rule.
Ill
I would therefore read the words “licensing and similar laws” as covering state licensing systems applicable primarily to the licensing of firms in the business of recruiting or *623 referring workers for employment, such as the state agricultural labor contractor licensing schemes in existence when the federal Act was created. This reading is consistent with the provision's history and language, and it minimizes the risk of harm of the kind just described.
The Act’s history supports this interpretation. Ever since 1964, the Federal Government has administered statutes that create a federal licensing scheme for agricultural labor contractors, firms that specialize in recruiting agricultural workers and referring them to farmers for a fee. Farm Labor Contractor Registration Act of 1963 (FLORA), 78 Stat. 920; Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 96 Stat. 2583. The statutes require agricultural labor contractors to register with the federal Secretary of Labor, to obtain a registration certificate (in effect a license), and to require the contractor's employees to carry that certificate with them when engaging in agricultural labor contracting activities. AWPA § 101; FLORA § 4. The statutes list a host of forbidden activities, one of which (prior to 1986) was hiring unauthorized aliens. See AWPA §§103, 106; FLORA §5(b). Prior to 1986, if the federal Labor Department believed a firm had violated these substantive provisions, it could institute administrative proceedings within the Labor Department. And if the Secretary found the labor contracting firm had violated the provisions, the Secretary could impose monetary penalties or withdraw the firm's registration. AWPA §§103, 503; FLORA §§ 5(b), 9.
Most important, and unlike the 1986 Act before us, the earlier agricultural labor contracting statutes did not -preempt similar state laws. To the contrary, the earlier Acts were “intended to supplement State law” and did not “excuse any person from compliance with appropriate State law and regulation.” AWPA §521; see FLORA § 12. By 1986, nearly a dozen States had developed state licensing systems for agricultural labor contractors, i. e., firms that recruited *624 and referred farm (and sometimes forestry) workers for a fee; some of these laws provided that state licenses could be revoked if the contractors hired unauthorized aliens. See, e. g., Cal. Lab. Code § 1690(f) (Deering Supp. 1991); 48 Pa. Cons. Stat. §§ 1301.503(4), 1301.505(3) (1965-1983 Supp. Pamphlet); Ore. Rev. Stat. §§658.405(1), 658.440(l)(d) (1987) (covering forestry workers).
In 1986, Congress (when enacting the Act now before us) focused directly upon the earlier federal agricultural labor contractor licensing system. And it changed that earlier system by including a series of conforming amendments in the Act. One amendment removes from the earlier statutes the specific prohibition against hiring unauthorized aliens. It thereby makes agricultural labor contractors subject to the Act’s similar general prohibition against such hiring. IRC A § 101(b)(1)(C) (repealing AWPA § 106). Another amendment takes from the Secretary of Labor most of the Secretary’s enforcement powers in respect to the hiring of unauthorized aliens. It thereby leaves agricultural labor contractors subject to the same single unified enforcement system that the immigration Act applies to all employers. See 29 U. S. C. § 1853. A third amendment, however, leaves with the Secretary of Labor the power to withdraw the federal registration certificate from an agricultural labor contractor that hired unauthorized aliens. IRCA § 101(b)(1) (B)(iii), 29 U. S. C. § 1813(a)(6). Thus, the Act leaves this subset of employers (i. e., agricultural labor contractors but not other employers) subject to a federal licensing scheme.
So far, the conforming amendments make sense. But have they not omitted an important matter? Prior to 1986, States as well as the Federal Government could license agricultural labor contractors. Should the 1986 statute not say whether Congress intended that dual system to continue? The answer is that the 1986 Act does not omit this matter. It answers the coexistence question directly with the parenthetical phrase we are now considering, namely, the *625 phrase, “other than through licensing and similar laws,” placed in the middle of the Act’s pre-emption provision. 8 U. S. C. § 1324a(h)(2). That phrase refers to agricultural labor contractors, and it says that, in respect to those licensing schemes, dual state/federal licensing can continue.
As of 1986, there were strong reasons for permitting that dual system to continue in this specialized area. Dual enforcement had proved helpful in preventing particularly serious employment abuses. See, e. g., 128 Cong. Ree. 24090 (1982) (reflecting concerns that agricultural workers were “housed in hovels; . . . subjected to physical abuse and kept in virtual slavery”). And because the contractors’ business consists of providing labor forces, their hiring of authorized workers is closely related to their general fitness to do business. See S. Rep. No. 202, 88th Cong., 1st Sess., 1 (1963) (explaining that farm labor contractor registration laws are needed to prevent “irresponsible crew leaders” from “exploiting] ... farmers”); Martin, Good Intentions Gone Awry: IRCA and U. S. Agriculture, 534 Annals Am. Acad. Pol. & Soc. Sci. 44, 49 (1994) (describing how farmers who relied on contractors risked losing their labor forces to immigration raids). Dual enforcement would not create a federal/state penalty disparity, for federal systems as well as state systems provide for license revocation. Experience had shown that dual enforcement had not created any serious conflict or other difficulty. And in light of the specialized nature and comparatively small set of businesses subject to dual enforcement, to permit licensing of that set of businesses would not seriously undermine the objectives of the Act or its preemption provision.
Thus, it is not surprising that the legislative history of the 1986 Act’s pre-emption provision says that the licensing exception is about the licensing of agricultural labor contractors. The House Report on the Act, referring to the licensing exception, states that the Committee did “not intend to preempt licensing or ‘fitness to do business laws,’ such as *626 state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.” H. R. Rep. No. 99-682, at 58 (emphasis added).
The Act’s language, while not requiring this interpretation, is nonetheless consistent with limiting the scope of the phrase in this way. Context can limit the application of the term “licensing” to particular types of licensing. The Act’s subject matter itself limits the term to employment-related licensing. And the Act’s specific reference to those who “recruit or refer for a fee for employment, unauthorized aliens,” is consistent with employment-related licensing that focuses primarily upon labor contracting businesses.
Thus, reading the phrase as limited in scope to laws licensing businesses that recruit or refer workers for employment is consistent with the statute’s language, with the relevant history, and with other statutory provisions in the Act. That reading prevents state law from undermining the Act and from turning the pre-emption clause on its head. That is why I consider it the better reading of the statute.
H-f
Another section of the Arizona statute requires every employer, after hiring an employee,” to “verify the employment eligibility of the employee” through the Federal Government’s E-Verify program. Ariz. Rev. Stat. Ann. §23-214. This state provision makes participation in the federal E-Verify system mandatory for virtually all Arizona employers. The federal law governing the E-Verify program, however, creates a program that is voluntary. By making mandatory that which federal law seeks to make voluntary, the state provision stands as a significant “ ‘obstacle to the accomplishment and execution of the full purposes and objectives of Congress/ ” Crosby, 530 U. S., at 373 (quoting Hines, 312 U. S., at 67). And it is consequently pre-empted.
*627 The federal statute itself makes clear that participation in the E-Verify program is voluntary. The statute’s relevant section bears the title “Voluntary Election to Participate in a Pilot Program.” IIRIRA §402, note following 8 U. S. C. § 1324a, p. 331. A subsection bears the further title, “Voluntary Election.” §402(a). And within that subsection, the statute says that employers “may elect to participate.” (Emphasis added.) The statute elsewhere requires the Secretary of Homeland Security to “widely publicize . . . the voluntary nature” of the program. § 402(d)(2); see also § 402(d)(3)(A) (requiring the designation of local officials to advertise the “voluntary nature” of the program). It adds that employers may “terminate” their “election” to participate by following certain procedures. § 402(c)(3). And it tells the Secretary of Homeland Security (as an earlier version told the Attorney General) that she “may not require any person or other entity to participate.” §402(a); see also § 402(e) (creating exceptions, none of which is applicable here, that require federal employers and certain others to participate in E-Verify or another pilot program).
Congress had strong reasons for insisting on the voluntary nature of the program. E-Verify was conceived as, and remains, a pilot program. Its database consists of tens of millions of Social Security and immigration records kept by the Federal Government. These records are prone to error. See, e. g., Office of the Inspector General, Social Security Administration, Congressional Response Report: Accuracy of the Social Security Administration’s Numident File 12 (2006) (hereinafter Social Security Report) (estimating that 3.3 million naturalized citizens are miselassified in a Social Security database used by E-Verify); GAO, Employment Verification: Federal Agencies Have Taken Steps To Improve E-Verify, but Significant Challenges Remain 16 (GAO-11-146, 2010) (hereinafter GAO Report) (noting that “erroneous [non-confirmations] related to name inconsistencies ... remain an issue” that “can create the appearance of discrimination *628 because of their disparate impact on certain cultural groups”). And making the program mandatory would have been hugely expensive. See post, at 644-645 (SOTOMAYOR, J., dissenting).
The E-Verify program is still a pilot program, as a matter of statute and practice. See IIRIRA §401; Letter from H. Couch to R. Stana (Dec. 8, 2010) (discussing aspects of E-Verify that have yet to be implemented). The effects of the program’s efforts to take account of, and correct for, potential errors remain uncertain. Congress could decide that, based on the results of the pilot, E-Verify should become a mandatory program. But it has not yet made that determination. And in making that decision, it will have to face a number of questions: Will workers receiving tentative negative verdicts understand the possibility of administrative challenge? Will they make the effort to invoke that process, say, traveling from a farm to an urban Social Security office? Will employers prove willing to undergo the financial burden of supporting a worker who might lose the challenge? Will employers hesitate to train those workers during the time they bring their challenges? Will employers simply hesitate to hire workers who might receive an initial negative verdict — more likely those who look or sound foreign? Or will they find ways to dismiss those workers? These and other unanswered questions convinced Congress to make E-Verify a pilot program, to commission continuous study and evaluation, and to insist that participation be voluntary.
In co-opting a federal program and changing the key terms under which Congress created that program, Arizona’s mandatory state law simply ignores both the federal language and the reasoning it reflects, thereby posing an “ ‘obstacle to the accomplishment’” of the objectives Congress’ statute evinces. Crosby, supra, at 373 (quoting Hines, supra, at 67).
The majority reaches a contrary conclusion by pointing out (1) that Congress has renewed the E-Verify program several *629 times, each time expanding its coverage, to the point where it now encompasses all 50 States; (2) that the E-Verify database has become more accurate; (3) that the Executive Branch has itself mandated participation for federal contractors; and (4) that the statute’s language tells the Secretary of Homeland Security, not the States, to maintain the program as voluntary.
The short, and, I believe, conclusive answers to these objections are: (1) Congress has kept the language of the statute — and the voluntary nature of the program — the same throughout its program renewals. See §2, 115 Stat. 2407; 117 Stat. 1944; §547, 123 Stat. 2177. And it is up to Congress, not to Arizona or this Court, to decide when participation in the program should cease to be voluntary.
(2) The studies and reports have repeatedly found both (a) that the E-Verify program had achieved greater accuracy, but (b) that problems remain. See, e. g., Social Security Report 11 (estimating that Social Security records contain 4.8 million “discrepancies that could require the numberholder to visit [the Social Security Administration] . . . before employment eligibility would be confirmed”); GAO Report 19 (estimating that, if E-Verify were made mandatory nationwide, 164,000 newly hired workers each year would erroneously be adjudged ineligible to work because of name mismatches, as when the worker’s “first or last name is incorrectly spelled in government databases or on identification documents”). And it is up to Congress, not to Arizona or this Court, to determine when the federally designed and federally run E-Verify program is ready for expansion.
(3) Federal contractors are a special group of employers, subject to many special requirements, who enter voluntarily into a special relation with the Government. For the Federal Government to mandate that a special group participate in the E-Verify program tells us little or nothing about the effects of a State’s mandating that nearly every employer within the State participate — as Arizona has done. And insofar as we have not determined whether the Executive was *630 authorized by Congress to mandate E-Verify for federal contractors, it says nothing about Congress’ intent.
(4) There is no reason to imply negatively from language telling the Secretary not to make the program mandatory, permission for the States to do so. There is no presumption that a State may modify the operation of a uniquely federal program like E-Verify. Cf. Buckman Co. v. Plaintiffs’ Legal Comm., 531 U. S. 341, 347-348 (2001); Boyle v. United Technologies Corp., 487 U. S. 500, 504-505 (1988); see also post, at 643-644 (Sotomayor, J., dissenting). The remaining federal statutory language makes clear the voluntary nature of the E-Verify program. Arizona’s plan would undermine that federal objective.
For these reasons I would hold that the federal Act, including its E-Verify provisions, pre-empts Arizona’s state law. With respect, I dissent from the majority’s contrary holdings.