ANN WALSH BRADLEY, J.
¶ 41. (concurring). After parsing and reframing the issues raised by the petitioner, this court ultimately asked the parties to address issues including the following: "whether a sentencing court may rely on a defendant's illegal immigrant status as a factor in fashioning a sentence."[1] The majority declines to address this important question of first impression.
*296 ¶ 42. Because appeals claiming error based on a sentencing court's multiple referrals to a defendant's immigration status appear to be on the rise,[2] I write separately to provide guidance in this ever expanding area of law.
¶ 43. Rather than focusing on the facts of this individual case, I discuss the broader principles of law and examine the question the parties were asked to brief but remains unaddressed by the majority.
¶ 44. Additionally, I write separately because the majority creates an explanation for the circuit court's exercise of discretion not set forth on the record. By creating its own explanation, the majority contravenes Wisconsin's long-standing jurisprudence, which does not permit appellate courts to invent a rationale for sentencing decisions not found in the record.
1 45. Instead, circuit courts must clearly set forth the rationale for sentencing so that it can be subject to meaningful appellate review. State v. Gallion. 2004 WI 42, ¶ 49, 270 Wis. 2d 535, 678 N.W.2d 197. This requirement was established in McCleary v. State, 49 Wis. 2d 263, 182 N.W.2d 512 (1971), reinvigorated in Gallion, and is sub silencio eroded by the majority opinion.
¶ 46. Accordingly, I respectfully concur.
*297 HH
¶ 47. There are three broad principles of law implicated in this discussion: alienage, immigration status, and the act of unlawful entry into the United States. I address each in turn.
A
¶ 48. At the onset, as the majority correctly observes, this court has repeatedly stated that nationality and national origin are improper sentencing factors.[3] Majority op., ¶ 25 (citations omitted). However, we have yet to provide similar guidance with respect to reliance on a defendant's alienage as an aggravating factor at sentencing.
¶ 49. The term "alien" refers to any person who is not a citizen of the United States.[4] 8 U.S.C. § 1101(a)(3). "Alienage" is the condition of being a noncitizen. Black's Law Dictionary 88 (10th ed. 2014).
¶ 50. In Graham v. Richardson, the United States Supreme Court explained that "classifications based on alienage, like those based on nationality or *298 race, are inherently suspect and subject to close judicial scrutiny" and that " [a]liens as a class are a prime example of a 'discrete and insular' minority for whom [] heightened judicial solicitude is appropriate." 403 U.S. 365, 372 (1971) (internal citations omitted).
¶ 51. Constitutional protections afforded to non-citizens include the rights of due process and equal protection. Plyler v. Doe, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); Hines v. Davidowitz, 312 U.S. 52, 69 (1941) ("Our Constitution and our Civil Rights Act have guaranteed to aliens 'the equal protection of the laws'. . ..").
¶ 52. In Plyler v. Doe, the United States Supreme Court struck down a Texas statute that allowed schools to deny enrollment to undocumented immigrant children. 457 U.S. 202. In so doing, the Court clarified that both due process and equal protection rights apply to all noncitizens within its jurisdiction. Id. at 210-15. As the Plyer court explained, the Fourteenth Amendment applies to "any person within its jurisdiction" and that noncitizens — no matter their immigration status— are "surely [] 'person[s]' in any ordinary sense of that term." Id. at 210. Further, the Court rejected the notion that due process is of greater stature than equal protection and therefore available to a larger class of persons, explaining that "both provisions were fashioned to protect an identical class of persons, and to reach every exercise of state authority." Id. at 213.
*299 ¶ 53. Similarly in Hines, the Supreme Court struck down a Pennsylvania Act that imposed registration requirements on all adult noncitizens. 312 U.S. at 74. The Hines court explained that the promise and guarantee of broad rights and privileges to noncitizens has been vital to the federal government's efforts to secure treaties and advance international practices that provide the same protections to United States citizens abroad. Id. at 64-65. It considered "the treatment of aliens, in whatever state they may be located, a matter of national moment" and that discriminatory policies directed at aliens constituted "a departure from our traditional policy of not treating aliens as a thing apart." Id. at 73.
¶ 54. Based on these constitutional implications, the State acknowledged at oral argument: "it is not permissible to sentence a person based on alien-age ..." I agree that courts may not rely on alienage as an aggravating factor at sentencing.[5]
*300 ¶ 55. This prohibition is consistent with the determinations in other jurisdictions. See, e.g., Yemson v. United States, 764 A.2d 816, 819 (D.C. 2001) (citing United States v. Gomez, 797 F.2d 417, 419 (7th Cir. 1986) for the proposition that treating a defendant more harshly at sentencing because of alien status "obviously would be unconstitutional."); United States v. Leung, 40 F.3d 577, 586-87 (2d Cir. 1994) (remanding for resentencing before a different judge because there was a sufficient risk that a reasonable observer might infer that the defendant's alien status played a role in determining her sentence).
B
¶ 56. Having addressed the question of whether a sentencing court can rely on alienage (non-citizenship) as an aggravating factor at sentencing, I now narrow the focus to consider only those nonciti-zens who are undocumented. More precisely I examine the question the parties were asked to brief: "whether a sentencing court may rely on a defendant's illegal immigrant status as a factor in fashioning a sentence."
¶ 57. Unlike the alienage discussion above, I offer no definitive answer because the law is not well-settled. Some jurisdictions clearly prohibit sentencing courts from relying on a defendant's undocumented status as an aggravating factor at sentenc *301 ing.[6] Others appear to.[7] And still others offer a more nuanced approach.[8]
*302 ¶ 58. Even without a definitive resolution, it is still apparent that the inquiry gives rise to significant thorny issues and caution must be observed. The law may be unsettled as to the direct inquiry presented, but it is well settled that reliance on undocumented immigrant status as an aggravating factor at sentencing can raise significant constitutional concerns. Due process requires that sentencing be individualized, avoiding reliance on stereotypes or other inaccurate information. State v. Harris, 2010 WI 79, ¶ 71, 326 Wis. 2d 685, 786 N.W.2d 409 (Ann Walsh Bradley, J., concurring); State v. Tiepelman, 2006 WI 66, ¶ 9, 291 Wis. 2d 179, 717 N.W.2d 1; Gallion, 270 Wis. 2d 535, ¶ 48.
¶ 59. "Individualized sentencing. . . has long been a cornerstone to Wisconsin's criminal justice jurisprudence." Gallion, 270 Wis. 2d 535, ¶ 48. Sentences must "be individualized to the defendant and his criminal conduct, and . . . bear a reasonable nexus to the recognized sentencing factors and objectives." Harris, 326 Wis. 2d 685, ¶ 101 (Ann Walsh Bradley, J., concurring); see also McCleary, 49 Wis. 2d at 275 (explaining that offenders are to be sentenced according to the needs of the particular case as determined by the offenders' degree of culpability and upon the mode of rehabilitation that appears to be of greatest efficacy).
¶ 60. Tailoring a sentence to address an individual defendant requires that sentencing courts refrain from relying on stereotypes, which are improper sentencing factors.[9] Harris, 326 Wis. 2d 685, ¶ 71 (Ann Walsh Bradley, J., concurring) (explaining that *303 "[w]e all agree that stereotypes constitute improper sentencing factors . . .").
¶ 61. Negative stereotypes about immigrants— and undocumented immigrants in particular — abound in some sectors. In response to such stereotypes, this court has recognized that evidence of an individual's undocumented immigration status has an "obvious prejudicial effect" on a jury when assessing loss of earning capacity in a negligence action. Gonzalez v. City of Franklin, 137 Wis. 2d 109, 139-40 (1987). Concerned about the effects of prejudice, the Gonzalez court explained that evidence of undocumented immigration status can only be introduced at the damages —but not the liability — phase of trial. Id. Similarly, circuit courts are prohibited from requiring defendants to disclose their citizenship status at the time a defendant enters a plea. Wis. Stat. § 971.06(3).
¶ 62. Defendants also have a constitutionally protected due process right to be sentenced upon accurate information. United States v. Tucker, 404 U.S. 443, 447 (1972); Tiepelman, 291 Wis. 2d 179, ¶ 9.
¶ 63. As this court has warned, "immigration law can be complex, and it is a legal specialty of its own." State v. Shata, 2015 WI 74, ¶ 42, 364 Wis. 2d 63, 868 N.W.2d 93. Accordingly, determinations about an individual's actual immigration status are left to *304 specialized federal immigration courts and agencies. Arizona v. United States, 132 S. Ct. 2492, 2498-99 (2012) (stating that determinations about immigration status falls within the exclusive jurisdiction of the federal government).
f 64. Of the estimated 11 million undocumented immigrants in the United States, 76,000 live in Wisconsin, a group that encompasses a great diversity of individuals and experiences.[10] Despite a perception held by some that all undocumented immigrants are law breakers or criminals, many immigrants are undocumented due to circumstances beyond their control. For example, so-called DREAMERS are undocumented immigrants who were brought to the United States when they were young. Plyler v. Doe, 457 U.S. at 219-20 (explaining that children who were brought to the United States unlawfully are not similarly situated to adults who entered the country unlawfully).
¶ 65. Other groups of immigrants who may at times be undocumented include asylum seekers fleeing persecution and victims of human trafficking. Further, undocumented victims of domestic violence may lack legal status solely because their abusers decline to file immigration papers on their behalf.[11] Many are subse *305 quently granted permission to remain in the United States.[12]
¶ 66. Additionally, immigration status is mutable and can change frequently. Plyler v. Doe, 457 U.S. at 226 (explaining that undocumented immigrants may be granted permission to remain in the United States or even become citizens). Indeed, nearly half of all undocumented immigrants entered the United States legally, but later violated the terms of their admission.[13]
¶ 67. Given that immigration status is often a moving target, and may even change during the course of criminal proceedings, care should be taken to avoid making assumptions that may very well turn out to be false. See Gallion, 270 Wis. 2d 535, ¶ 36 ("Experience has taught us to be cautious when reaching high *306 consequence conclusions about human nature that seem to be intuitively correct at the moment. Better instead is a conclusion that is based on more complete and accurate information and reached by an organized framework for the exercise of discretion."); United States v. Velasquez Velasquez, 524 F.3d 1248, 1253 (11th Cir. 2008) (remanding for resentencing because "a judge may not impose a more severe sentence than he would have otherwise based on unfounded assumptions regarding an individual's immigration status or on his personal views of immigration policy").
¶ 68. In sum, relying on a defendant's undocumented immigrant status as an aggravating factor may lead sentencing courts down a slippery slope, potentially raising significant constitutional concerns. Care must be taken to ensure that sentences are individualized and do not rely on stereotypes, assumptions, or other inaccurate information.
C
¶ 69. I address next how a circuit court may consider a defendant's act of unlawful entry into the United States.
¶ 70. It is not a crime for an undocumented immigrant to remain in the United States. Additionally, removal proceedings of immigrants who are in the United States unlawfully are civil, not criminal, proceedings. Arizona v. United States, 132 S. Ct. at 2499. However, the act of unlawful entry into the United States is a federal crime, punishable by a fine and/or imprisonment of not more than six months for a first offense. 8 U.S.C. § 1325(a).
¶ 71. As the majority correctly states, sentencing courts may consider uncharged and unproven offenses as well as facts related to offenses for which the *307 defendant has been acquitted. Majority op., ¶ 23 (citing State v. Frey, 2012 WI 99, ¶ 47, 343 Wis. 2d 358, 817 N.W.2d 436).
f 72. It follows that upon reliable and accurate information, sentencing courts may consider a defendant's act of unlawful entry into the United States in the same way that it would consider any other unlawful or uncharged conduct. Gomez, 797 F.2d at 420 (explaining that unlawful entry is an act "no different than any other recent prior illegal act of any defendant being sentenced for any offense"); State v. Zavala-Ramos, 840 P.2d 1314, 1316 (Or. App. 1992) (concluding that " [immigration status per se is not relevant. However, circumstances that demonstrate a defendant's unwillingness to conform his conduct to legal requirements, whether or not there are criminal consequences, may be.").
¶ 73. However, circuit courts that consider a defendant's act of unlawful entry should set forth clearly on the record how any unlawful entry is relevant to the sentence. See Gallion, 270 Wis. 2d 535, f¶ 42-43, 46. Sentencing courts must provide a "rational and explainable basis" for the sentence imposed. Id., ¶ 39 (citing McCleary, 49 Wis. 2d at 276). Implied rationale is insufficient. Id., ¶ 38. By explaining this linkage on the record, "courts will produce sentences that can be more easily reviewed for a proper exercise of discretion." Id., ¶ 46.
f 74. Other jurisdictions emphasize the importance of establishing a linkage between the act of unlawful entry and the defendant's individualized sentence. In Yemson, the sentencing court discussed the defendant's pending and prior charges including convictions for unlawful reentry into the United States. 764 A.2d at 818. The District of Columbia Court of *308 Appeals upheld the sentence, concluding that the defendant's immigration status did not serve as the basis for the sentence, but rather that the sentence was based on the defendant's "unlawful conduct." Id. at 820.
¶ 75. Yemson explained that sentencing courts may consider a defendant's prior acts of unlawful reentry into the United States as such acts are relevant to the defendant's history of violating the law. Id. at 819. To successfully challenge such references, the defendant must demonstrate that the sentencing court's comments about his undocumented immigration status "bore no reasonable relationship to his established pattern of misconduct and that those comments formed the actual basis for the imposition of an enhanced sentence." Id.
f 76. Thus, sentencing courts that consider a defendant's prior act of unlawful entry into the United States can do so only upon accurate information that the defendant actually entered the country unlawfully, in the same way that it would consider any other unlawful or uncharged conduct. Additionally, sentencing courts should set forth clearly on the record how a defendant's act of unlawful entry is relevant to the sentence imposed.
I — I
¶ 77. Finally, I write because Wisconsin s longstanding jurisprudence examining review of sentencing decisions does not permit appellate courts to invent a rationale not found in the record.
¶ 78. Instead, circuit courts must clearly set forth the sentencing rationale so that it can be subject to meaningful appellate review. Gallion, 270 Wis. 2d *309 535, ¶ 49. This requirement was established in McCleary, reinvigorated in Gallion, and has become an essential part of the fabric of Wisconsin's sentencing law.
¶ 79. Nevertheless, the majority rests its conclusion that the circuit court properly exercised its discretion on a non-existent sentencing court rationale. In so doing, it appears to turn back the clock and erode the advances made in improving transparency and review of sentencing decisions.
¶ 80. The majority posits that the circuit court considered Salas Gayton's undocumented immigration status only when discussing the nature of the offense of operating without a license. It explains that Salas Gayton's "immigration status was directly relevant to one of the charges for which he received a sentence: driving without a license." Majority op., ¶ 33. Further, it contends that Salas Gayton's unlawful entry into the United States prevented him from possessing a driver's license and therefore "his unlawful entry related to an element of a crime for which he was convicted . ..." Id. Reiterating its own rationale, the majority concludes that "any" references to Salas Gayton's immigration status were "directly relevant to his conviction for homicide while operating a vehicle without a driver's license." Majority op., ¶ 37.
¶ 81. The record reflects otherwise. Rather than linking Salas Gayton's undocumented immigration status with the nature of the offense, the circuit court emphasized that Gayton's immigration status was relevant only to its analysis of his "character" (emphasis added).
¶ 82. The sentencing record contains no expressed linkage between Salas Gayton's immigration status and the nature of the offense of operating a *310 vehicle without a license.[14] Indeed, the sentencing court explicitly disclaimed it: " The fact that you're an illegal alien doesn't enter into the serious nature of the crime or the need to protect the community. It goes to character. It's a minor character flaw very honestly." Majority op., f 15.
¶ 83. Thus, by determining that references to Salas Gayton's immigration status were related to the offense of operating without a license, the majority creates a rationale not expressed by the circuit court. Majority op. ¶[¶ 33, 37.
¶ 84. To support its creation of an explanation for the sentencing decision, the majority relies on caselaw unrelated to sentencing. It contends that an appellate court that reviews the exercise of sentencing discretion "may search the record for reasons to sustain the circuit court's exercise of discretion" and that a sentencing court's exercise of discretion "will be upheld if the appellate court can find facts of record which would support the circuit court's decision." Majority op., ¶ 20 (citing State v. LaCount, 2008 WI 59, ¶ 15, 310 Wis. 2d 85, 750 N.W.2d 780) (discussing whether a circuit court *311 erroneously admitted an attorney's expert opinion testimony about the defendant at trial); Peplinski v. Fobe's Roofing, Inc., 193 Wis. 2d 6, 20, 531 N.W.2d 597 (1995) (a negligence case examining the standard of review to be applied when addressing the sufficiency of the evidence for a res ipsa loquitur jury instruction)).
¶ 85. However, Wisconsin's long-standing sentencing jurisprudence does not permit appellate courts to search the record to support sentencing rationales never expressed.
¶ 86. Over four decades ago, this court in McCleary embraced a requirement that sentencing rationale be set forth on the record. The McCleary court clarified that " [discretion is not synonymous with decision-making. Rather, the term contemplates a process of reasoning." 49 Wis. 2d at 277 (emphasis added). Emphasizing the import of the decision-making process, McCleary explained that "a principal obligation of the judge is to explain the reasons for his actions." Id. at 280-81. Accordingly, appellate review of sentencing decisions focuses on the circuit court's decision-making process, not just the sentence imposed. Id.
¶ 87. Gallion subsequently reinvorgated McCleary, reiterating that a sentencing decision cannot be understood or reviewed by appellate courts "unless the reasons for decisions can be examined." 270 Wis. 2d 535, ¶ 1 (citing McCleary, 49 Wis. 2d at 280-81). A circuit court's rationale for its decision serves to demonstrate that the sentencing decision was exercised on a "rational and explainable basis." Id., ¶ 49 (citing McCleary, 49 Wis. 2d at 276).
¶ 88. Relying on this distinction between making a decision and the process of decision-making, the Gallion court concluded by setting forth the require *312 ments for appellate review of sentencing: appellate courts are to review the circuit court's linkages between the relevant facts, sentencing factors, and sentencing objectives evident on the record and closely scrutinize the record to ensure that the basis of the circuit court's exercise of discretion is set forth. 270 Wis. 2d 535, ¶¶ 46, 76.
¶ 89. Because the majority opinion erodes this requirement, I respectfully concur.
¶ 90. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this concurrence.

 Unless it is included in quoted text, I avoid using the term "illegal alien." I chose to use the term "undocumented immigrant" instead. Although no shorthand term may be perfect, I join the United States Supreme Court as well as other courts that use the term "undocumented immigrant." Mohawk Indus., Inc. v. Carpenter, 558 U.S. 100 (2009); De La *296 Paz v. Coy, 804 F.3d 1200 n.1 (5th Cir. 2015) (Prado, J., dissenting); In re Garcia, 315 P.3d 117, 120 n.1 (Cal. 2014). Use of this term avoids some of the problematic and pejorative connotations of alternative terms.

 As court of appeals Judge Kessler observed in her concurrence, appeals claiming error in sentencing based on the sentencing court's multiple referrals to a defendant's race, ethnicity, or immigration status appear to be on the rise. State v. Gayton, No. 2013AP646-CR, unpublished slip op., ¶ 23 (Wis. Ct. App. Oct. 7, 2014) (Kessler, J., concurring).

 National origin refers to the country where a person was bom, or, more broadly, the country from which his or her ancestors came. Espinoza v. Farah Mfg. Co., Inc., 414 U.S. 86, 88-89 (1973). Thus it is "an immutable characteristic determined solely by the accident of birth." Frontiero v. Richardson, 411 U.S. 677, 686 (1973).

 Finding the use of the term "alien" to be offensive, the Sixth Circuit has urged Congress to eliminate the term from the U.S. Code. Flores v. U.S. Citizenship and Immigration Servs., 718 F.3d 548, 551 n.1 (6th Cir. 2013). I refer to it here only because it remains a term of art in federal immigration statutes.

 Empirical evidence indicates that a "citizenship penalty" exists when noncitizens — and undocumented immigrants in particular — face harsher criminal penalties than citizens. A study of data from U.S. federal courts revealed strong and consistent evidence that non-citizens are sentenced far more harshly than citizens among all racial and ethnic groups. Michael T. Light, Michael Massoglia, and Ryan D. King, Citizenship and Punishment: The Salience of National Membership in U.S. Criminal Courts, 79 Am. Sociological Rev. 827, 837, 841, 843-44 (Oct. 2014).
Specifically, documented immigrants are reported as twice as likely as citizens to be imprisoned, and undocumented immigrants are seven times more likely to be incarcerated than citizens. Id. at 837. The study further indicates that noncitizens receive longer prison sentences compared to U.S. citizens. Id. at 839. Additionally, citizenship status — for both legal and undocumented immigrants — appears more *300 consequential for sentencing outcomes today than it was two decades ago. Id. at 840 (explaining that the "citizenship penalty" more than doubled between 1992 and 2008).

 See, e.g., State v. Mendoza, 638 N.W.2d 480, 484 (Minn. Ct. App. 2002) (determining that the sentencing court erred by considering the defendant's immigration status and possible deportation); Martinez v. State, 961 P.2d 143, 145 (Nev. 1998) (concluding that basing a sentencing decision, in part, upon a defendant's undocumented immigration status would violate the defendant's due process rights); State v. Zavala-Ramos, 840 P.2d 1314, 1316 (Or. Ct. App. 1992) ("a defendant's current illegal immigration status cannot, per se , be considered to be an aggravating factor" because it is not relevant).

 See, e.g., People v. Hernandez-Clavel, 186 P.3d 96, 100 (Colo. App. 2008) (concluding that the sentencing court did not err in considering the circumstances surrounding the defendant's status as an undocumented immigrant when deciding whether to grant or deny probation); Trujillo v. State, 698 S.E.2d 350, 354 (Ga. Ct. App. 2010) (determining that the trial court did not violate the defendant's constitutional rights by considering his undocumented immigration status as a relevant factor in formulating an appropriate sentence); People v. Cesar, 14 N.Y.S. 3d 100, 102 (2d Dep't. 2015) (concluding that "while a defendant's undocumented immigration status may be considered by sentencing courts as one factor in determining whether an appropriate sentence should include incarceration, probation, or a combination of both, courts may not rely solely upon a defendant's undocumented immigration status in imposing a sentence of incarceration to the exclusion of all other relevant factors.").

 See, e.g., United States v. Flores-Olague, 717 F.3d 526, 535 (7th Cir. 2013) (determining it was not improper for the sentencing court to state in non-hyperbolic fashion that the defendant was in the country unlawfully and did not speak English because those statements were relevant to reflect the strength of the defendant's ties to the community as they relate to the likelihood of his successful post-incarceration adjustments to society); United States v. Ramirez-Fuentes, 703 F.3d 1038, 1047 (7th Cir. 2013) ("Although a sentencing court can, in its discretion, take into account a defendant's status as a deportable alien, it need not take into account those argu *302 ments that are frivolous or, in the context of the case, 'stock' arguments without specific application to the defendant") (internal citations omitted).

 Similarly, punishment based on a particular "status" is prohibited. See, e.g., Robinson v. California, 370 U.S. 660, *303 665-667 (1962) (determining that a California statute criminalizing the "status" of being addicted to narcotics was unconstitutional); United States v. Diamond, 561 F.2d 557, 559 (4th Cir. 1977) (concluding it is improper to consider a defendant's status as a nonresident of the state at sentencing); see also Jackson v. State, 772 A.2d 273, 282 (Md. 2001) (stating that a defendant's geographical origins "would clearly be an improper factor upon which to base a defendant's sentence").

 Jie Zong and Jeanne Batalova, Frequently Requested Statistics on Immigrants and Immigration in the United States, Migration Policy Institute (MPI) (Apr. 14, 2016), http://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states.

 See, e.g., Mary Ann Dutton, Leslye E. Orloff, and Giselle Aguilar Hass, Characteristics of Help-Seeking Behaviors, Resources and Service Needs of Battered Immigrant Lati-nas: Legal and Policy Implications, 7 Geo. J. on Poverty L. & Pol'y 245, 259 (Summer 2000).

 Memorandum from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to David Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("DACA Memo"), https://www.dhs.gov/xlibrary/assets/sl-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf; 8 U.S.C. § 1101(a)(15)(T)-(U) (relief for victims of human trafficking and other crimes who assist in the investigation or prosecution of criminal activity); 8 U.S.C. § 1154 (protection for some battered spouses of U.S. citizens); 8 U.S.C. § 1158(a)(1) ("any alien who is physically present in the United States . . . irrespective of such alien's status, may apply for asylum"); United States v. Velasquez Velasquez, 524 F.3d 1248, 1253 (11th Cir. 2008) (explaining that "because oppressive regimes do not easily permit their citizens to leave the country, many escape by using false papers; doing so does not disqualify them from seeking asylum.").

 Pew Hispanic Center, Modes of Entry for the Unauthorized Migrant Population, at 1 (May 22, 2006), http://www.pewhispanic.org/files/factsheets/19.pdf.

 The sentencing court referred to the charge of driving without a license twice. First it stated:
You apparently had been warned by somebody, maybe the judge in Racine County, that you can't drive. There is a reason that we have licenses in this country and all the world, and that is we just don't let anybody get behind that automobile which can be a weapon.
Later, when discussing the serious nature of the crime, the circuit court explained:
The fact that you didn't have a driver's license entered into it, the fact that you were driving the wrong way, the fact that you were speeding, the fact you went a mile, the fact that you didn't know, didn't even know that you were driving, that enters into it, because that makes what you did that much worse.